JH

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MIKEL PERNELL,                            )
                                          )
              plaintiff,                  )
                                          )
       vs.                                )        No. 03 C 5316
                                          )
Chicago police officers EDWARD FARLEY,    )        JUDGE KENNELLY
Star NO. 20643; THOMAS KELLY, Star No.    )
20229; ROBERT LENIHAN, Star No. 20593;    )
JAMES RILEY, Star No. 20250; THE CITY OF  )
CHICAGO, a municipal corporation; and     )
unknown and unnamed officers,             )
                                          )
              defendants.                 )

**NOTICE OF FILING**

**F I L E D**

APR 2 5 2005

MICHAEL W DOBBINS
CLERK, U.S. DISTRICT COURT

TO:    Edward M. Fox                       Penny George
       ED FOX & ASSOCIATES                 Assistant Corporation Counsel
       300 W. Adams Street; Suite 330       30 N. LaSalle Street; Suite 900
       Chicago, IL 60606                   Chicago, IL 60602
       FAX (312) 853-3489

       **PLEASE TAKE NOTICE** that I have this day filed with the Clerk of the United States
District Court for the Northern District of Illinois, Eastern Division, **Defendant Farley, Kelly,
Lenihan, and Riley's Motion for Summary Judgment as to Count II of the Amended
Complaint, Defendants Farley, Kelly, Lenihan, and Riley's Memorandum in Support of
Their Motion for Summary Judgment,** and **Defendants Farley, Kelly, Lenihan, and Riley's
Local Rule 56.1(a)(3) Statement of Facts,** copies of which are attached hereto and herewith
served upon you.

       **DATED** at Chicago, Illinois this 25th day of April, 2005.

                                          Respectfully Submitted,

30 North La Salle St. #1400        BY:    _____
Chicago, Illinois 60602                   STACY A. BENJAMIN
(312) 742-5146                            Assistant Corporation Counsel
Attorney Number 06255621                  Respectfully submitted,

## CERTIFICATE OF SERVICE

I hereby certify that I have caused true and correct copies of the above and foregoing **Notice of Filing, Defendant Farley, Kelly, Lenihan, and Riley's Motion for Summary Judgment as to Count II of the Amended Complaint, Defendants Farley, Kelly, Lenihan, and Riley's Memorandum in Support of Their Motion for Summary Judgment,** and **Defendants Farley, Kelly, Lenihan, and Riley's Local Rule 56.1(a)(3) Statement of Facts** to be hand-delivered to the persons named in the foregoing Notice, on this 25th day of April, 2005.

STACY A. BENJAMIN

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| MIKEL PERNELL, | ) | |
| | ) | |
| plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 03 C 5316 |
| | ) | |
| Chicago police officers EDWARD FARLEY, | ) | JUDGE KENNELLY |
| Star NO. 20643; THOMAS KELLY, Star No. | ) | |
| 20229; ROBERT LENIHAN, Star No. 20593; | ) | |
| JAMES RILEY, Star No. 20250; THE CITY OF | ) | |
| CHICAGO, a municipal corporation; and | ) | |
| unknown and unnamed officers, | ) | |
| | ) | |
| defendants. | ) | |

F I L E D

APR 2 5 2005

MICHAEL W DOBBINS
CLERK. U.S. DISTRICT COURT

## DEFENDANT FARLEY, LENIHAN, KELLY AND RILEY'S
## LOCAL RULE 56.1(A)(3) STATEMENT OF FACTS

Defendants, Edward Farley, Thomas Kelly, Robert Lenihan, and James Riley, by one of

their attorneys, Stacy A. Benjamin, Assistant Corporation Counsel for the City of Chicago,

respectfully submits this Local Rule 56.1(a)(3) Statement of Facts in support of their motion for

summary judgment on Count II of Plaintiff's Amended Complaint.

1.      On June 27, 2000, at approximately 9:30 p.m., based upon statements of Melvin

and Gregory Phillips, the shooting victims at Ogden Park, Defendants Kelly and Riley arrested

Mikel Pernell. (Report of Proceedings, testimony of Det. Kelly at the Motion to Quash Arrest

and Suppress Evidence, February 21, 2002, at 4, 6-12, 17-18, attached as Exhibit A; Report of

Proceedings, testimony of Officer Gregory Dobson at the Motion to Quash Arrest and Suppress

Evidence, May 6, 2002, at 24 - 26, attached as Exhibit B; Pernell's Arrest Report, attached as

Exhibit C).

2. Pernell was sent to court and received a probable cause hearing on July 2, 2000. (Exhibit C; Certified Statement of Conviction/Disposition case no. 00113319001, attached as Exhibit D).

3. Pernell was charged with the murders of Valerie Davis and James Jones and Aggravated Battery for the shootings of Melvin and Gregory Phillips. (Exhibit C; Exhibit D; and Misdemeanor Aggravated Battery Complaints, attached as Exhibit E).

4. Pernell was subsequently indicted on the murder and aggravated battery charges on July 31, 2000. (Certified Statement of Conviction/Disposition, case no. 00 CR 1836201, attached as Exhibit F).

5. During the course of the criminal proceedings, Pernell filed a motion to suppress his statement, including the video statement in which he admitted to shooting out of a vehicle as he fled Ogden Park, on the grounds that his statements were involuntary. (Amended Motion to Suppress Statements, attached as Exhibit G; Exhibit F).

6. Pernell's motion to suppress argued that his statements were the result of physical and psychological coercion. Specifically, he argued in the Motion that the statements should be suppressed because he was locked in a small room for 66 hours, denied the use of the restroom, given minimal amounts of food and water, refused phone calls to a lawyer and family, not given Miranda warnings, denied asthma medications, and repeatedly struck in the back of his head, shoved and threatened by numerous Chicago Police Detectives. (Exhibit G).

7. The trial court granted Plaintiff's motion to suppress his statements on February 26, 2003. (Exhibit F).

8. On April 10, 2003, all charges against Pernell were *nolle prosequi* by the State's

2

Attorney's Office. (Exhibit F).

9.     Plaintiff filed his Complaint at Law in this case on July 31, 2003, (Attached as

Exhibit H); and an Amended Complaint on September 12, 2004 (attached at Exhibit I).

Respectfully submitted,

STACY A. BENJAMIN
Assistant Corporation Counsel

30 N. LaSalle Street, Suite 1400
Chicago, Illinois 60602
(312) 742-5156

3

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MIKEL PERNELL, | ) | |
| | ) | |
| plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 03 C 5316 |
| | ) | |
| Chicago police officers EDWARD FARLEY, | ) | JUDGE KENNELLY |
| Star NO. 20643; THOMAS KELLY, Star No. | ) | |
| 20229; ROBERT LENIHAN, Star No. 20593; | ) | |
| JAMES RILEY, Star No. 20250; THE CITY OF | ) | |
| CHICAGO, a municipal corporation; and | ) | |
| unknown and unnamed officers, | ) | |
| | ) | |
| defendants. | ) | |

*FILED*

*APR 2 5 2005*

*MICHAEL W DOBBINS*
*CLERK, U.S. DISTRICT COURT*

## DEFENDANT FARLEY, LENIHAN, KELLY AN RILEY'S MEMORANDUM OF LAW IS SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT ON COUNT II OF THE AMENDED COMPLAINT

Defendants, Edward Farley, Thomas Kelly, Robert Lenihan, and James Riley, by one of

their attorneys, Stacy A. Benjamin, Assistant Corporation Counsel for the City of Chicago,

respectfully submits this memorandum of law in support of their motion for summary judgment

on Count II of Plaintiff's Amended Complaint.

### INTRODUCTION

On June 27, 2000, at about 5:00 p.m., Melvin and Gregory Phillips were both shot while

near the basketball courts at Ogden Park over a drug-related gang dispute. A few minutes later,

about four blocks away, at 63rd Street and Bishop, a single bullet entered a car driven by Valerie

Davis, killing both her and the passenger, James Jones. Plaintiff, Mikel Pernell was arrested for

the shooting in Ogden Park later that evening after witnesses identified him as one of the

shooters.

After multiple interviews with Defendants, other Detectives, and Assistant State's

1

Attorneys and after giving a video statement in which Plaintiff described how he was shooting out of a car window as he fled Ogden Park, Plaintiff was charged with the murders of Davis and Jones and Aggravated Battery for his participation in the shooting of Melvin and Gregory Phillips in the park. Plaintiff was subsequently brought before a judge for a probable cause hearing on July 2, 2000. It is this time frame between his arrest on June 27, 2000, and probable cause hearing on July 2, 2000, that is at the heart of Count II, which is characterized as a "Failure to Promptly Process Plaintiff following his Arrest."

As discussed herein, Defendants are entitled to judgment as a matter of law on this count. Count II is not actionable because it is barred by the applicable two-year statute of limitations. Plaintiff brought his unlawful detention claim on July 31, 2003, over three years after his alleged unconstitutional detention claim accrued. Because the applicable statute of limitations requires that Plaintiff's Fourth Amendment claim be brought within two years of the alleged constitutional violation, Defendants are entitled to summary judgment on Count II.

## STATEMENT OF THE CASE

On July 31, 2003, Plaintiff filed a six-count complaint against the City of Chicago and Police Detectives Farley, Lenihan, Kelly and Riley, alleging that the defendants are liable for violations of his civil rights. An Amended Complaint was filed on September 13, 2004 to add a Monell policy claim against defendant City. This motion deals specifically with Count II, which alleges a §1983 claim that the Individual Defendants failed to promptly process Plaintiff following his arrest, in violation of his Constitutional rights.

Defendants now move, pursuant to Fed. R. Civ. P. 56, for summary judgment as to Count II. The relevant evidence shows that there is no genuine issue as to any material fact regarding the applicable statute of limitations. Plaintiff's claim that his constitutional rights were violated

2

by an extended detention is time-barred because it was not brought within two years of accrual. For this reason, Defendants are entitled to a judgment in their favor on Count II of plaintiff's Amended Complaint as a matter of law.

## STATEMENT OF FACTS

Defendants' statement of facts is set forth in Defendant Farley, Lenihan, Kelly and Riley's Local Rule 56.1(a)(3) Statement, filed separately.

## STANDARD FOR SUMMARY JUDGMENT

A court should grant summary judgment if "there is no genuine issue of material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The burden is on the moving party to identify portions of the pleadings, depositions, and other discovery-related materials that demonstrate an absence of a genuine issue of material fact. See id.; Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The burden then shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(c). The simple assertion that a factual dispute exists is not enough to defeat a Rule 56(c) motion. "Merely alleging a factual dispute cannot defeat the summary judgment motion." Samuels v. Wilder, 871 F.2d 1346, 1349 (7th Cir. 1989). To defeat a motion for summary judgment, the non-moving party must set forth specific facts, through affidavits or other materials, that demonstrate disputed material facts. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). A fact is genuinely in dispute when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. In deciding a motion for summary judgment, the court must read the facts in a light most favorable to the non-moving party. Id. at 255.

Summary judgment is properly granted on the basis of a statute of limitations defense if "(1) the statute of limitations has run, thereby barring the plaintiff's claim as a matter of law, and (2) there exists no genuine issues of material fact regarding the time at which plaintiff's claim has accrued and the application of the statute to plaintiff's claim which may be resolved in plaintiff's favor." Massey v. United States, 312 F.3d 272, 276 (7th Cir. 2002) (quoting Yorger v. Pittsburgh Corning Corp., 733 F.2d 1215, 1219 (7th Cir. 1984).

## ARGUMENT

**I.      The Statute of Limitations Bars Plaintiff's Claim That His Constitutional Rights Were Violated by a Failure to Promptly Present Him for a Probable Cause Hearing.**

Plaintiff's unlawful extended detention claim is time-barred because it was not brought within two years of the date he was brought before a judge for a probable cause hearing. Plaintiff was arrested on June 27, 2000, and he received a probable cause hearing on July 2, 2000. Plaintiff first filed his Complaint at Law on July 31, 2003. Plaintiff's claims should have been brought by July 2, 2002. Because he did not file this claim until July 31, 2003 the claim is time barred.

The statute of limitations for §1983 is dictated by the "personal injury statute of limitations in the state where the alleged injury occurred." Kelly v. City of Chicago, 4 F.3d 509, 511 (7th Cir. 1993). In Illinois, the statute of limitations is two years from the date of accrual. 735 ILCS 5/13-202. Following Heck v. Humphrey, 512 U.S. 477 (1994), the Seventh Circuit has routinely held that civil rights claims of unlawful detention between arrest and the filing of criminal charges arising out of the Fourth Amendment begin to accrue at the time of arrest regardless of subsequent proceedings. See e.g., Newsome v. McCabe, 256 F.3d 747, 749 (7th Cir. 2001); Gonzalez v. Entress, 133 F.3d 551, 554 (7th Cir. 1998). The rationale behind this approach is that an unlawful detention claim does not necessarily undermine a conviction;

4

"wrongful detentions [are] actionable under state law and the fourth amendment, no matter what happens to the criminal prosecution." Gonzalez, 133 F.3d at 553.

While the Seventh Circuit has recently recognized limited exceptions to this general rule of accrual, see, Wiley v. City of Chicago, 361 F.3d 994,997 (2004), and Gauger v. Hendle, 349 F.3d 345, 361 (2003), Plaintiff's unlawful extended detention claim is not one of the recognized exceptions. Wiley and Gauger recognized that under certain circumstances, a false arrest claim could necessarily imply the invalidity of conviction, and therefore, under Heck, the cause of action accrues at the time the charges are dismissed or the conviction reversed. Plaintiff's claim that his Constitutional rights were violated by the extended period of time between his arrest and probable cause hearing was immediately actionable once he received his probable cause hearing as the wrong alleged was complete. Such an action, if successful, would have had little, if any impact on any subsequent criminal conviction. Consequently, the holding in Heck does not delay the accrual of Plaintiff's claim that he failed to receive a prompt determination of probable cause because "the injury of being detained illegally is compensable regardless of whether the plaintiff is later convicted or even prosecuted." Snodderly v. R.U.F.F. Drug Enforcement Task Force, 239 F.3d 892, 897 (7th Cir. 2001).

Plaintiff was arrested on June 27, 2000, at approximately 9:30 p.m. (56.1 ¶ 1.) He was brought before a judge for a probable cause hearing on July 2, 2000. (56.1 ¶ 2.) Plaintiff claims that this time frame was unconstitutional pursuant to the guidelines set forth in County of Riverside v. McLaughlin, 500 U.S. 44, 56-57 (1991). However, the merits of this claim should never be reached because the undisputed fact is he did not bring any such claim until July 31, 2003. (56.1 ¶ 9). The applicable statute of limitations gave plaintiff until July 2, 2002 to bring these claims. Gonzalez, 133 F.3d at 553-4. Because Plaintiff failed to comply with the

5

applicable statute of limitations, summary judgement should be granted in favor of Defendants on Count II.

## CONCLUSION

For the reasons set forth above, the Defendants Farley, Lenihan, Riley and Kelly respectfully requests that this Court enter summary judgment in their favor on Count II of Plaintiff's Amended Complaint.

Respectfully submitted,

STACY A. BENJAMIN
Assistant Corporation Counsel

30 N. LaSalle St.; Suite 1400
Chicago, Illinois 60602
(312) 742-5146
(312) 744-6566 (FAX)
ATTY. NO. 06255621

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MIKEL PERNELL, | ) |
| | ) |
| plaintiff, | ) |
| | ) |
| vs. | ) No. 03 C 5316 |
| | ) |
| Chicago police officers EDWARD FARLEY, | ) JUDGE KENNELLY |
| Star NO. 20643; THOMAS KELLY, Star No. | ) |
| 20229; ROBERT LENIHAN, Star No. 20593; | ) |
| JAMES RILEY, Star No. 20250; THE CITY OF | ) |
| CHICAGO, a municipal corporation; and | ) |
| unknown and unnamed officers, | ) |
| | ) |
| defendants. | ) |

## DEFENDANT FARLEY, LENIHAN, KELLY AN RILEY'S MOTION FOR SUMMARY JUDGMENT ON COUNT II OF THE AMENDED COMPLAINT

Defendants, Edward Farley, Thomas Kelly, Robert Lenihan, and James Riley by one of

their attorneys, Stacy A. Benjamin, Assistant Corporation Counsel, hereby move for summary

judgment as to Count II of the Amended Complaint pursuant to Federal Rule of Civil Procedure

56. In support of this motion, Defendants state as follows:

1.    Plaintiff was arrested on June 27, 2000, at approximately 9:30 p.m. He was first

taken for a determination of probable cause on July 2, 2000. Plaintiff claims in Count II of the

Amended Complaint that Defendants failed to promptly present him for a determination of

probable cause following his warrantless arrest, in violation of his Constitutional rights.

2.    Defendants are entitled to summary judgment on this count because it was not

timely brought against them. Plaintiff filed this action on July 31, 2003, over two-years after the

applicable statue of limitation and accrual of his cause of action. Accordingly, the claim is time-

barred and Defendants are entitled to judgment as a matter of law as to Count II

WHEREFORE, for the reasons stated herein and in Defendants Farley, Kelly, Lenihan, and Riley's Memorandum in Support of Their Motion for Summary Judgment, Defendants respectfully request this Court grant summary judgment in their favor as to Count II and for any other relief this Court deems appropriate.

Respectfully submitted,

30 North LaSalle St. Suite 1400
Chicago, Illinois 60602
(312) 742-5146
Atty no. 06255621

STACY A. BENJAMIN
Assistant Corporation Counsel

1   STATE OF ILLINOIS )
                      ) SS
2   COUNTY OF C O O K )

3          IN THE CIRCUIT COURT OF COOK COUNTY
           COUNTY DEPARTMENT-CRIMINAL DIVISION
4
    THE PEOPLE OF THE        )
5   STATE OF ILLINOIS,       )
                             )
6          Plaintiff,        )
                             )
7          -vs-              )  No. 00-18362
                             )
8   MIKEL PERNELL,           )
                             )
9          Defendant.        )

10

11         <u>MOTION TO QUASH ARREST AND SUPPRESS EVIDENCE</u>

12             REPORT OF PROCEEDINGS had in the hearing

13  of the above-entitled cause, before the HONORABLE

14  THOMAS R. SUMNER, Judge of said Court, on the 21st

15  day of February, A.D., 2002.

16         APPEARANCES:

17             HON. RICHARD A. DEVINE,
                   State's Attorney of Cook County, By:
18             MR. RAYMOND BROGAN,
                   Assistant State's Attorney,
                   Appeared for the Plaintiff;
19
20             MR. GREGG SMITH,
                   Attorney at Law,
                   Appeared for the Defendant.
21

22

23  JAMES M. DONAHUE
    Official Court Reporter
24  Certificate No. 084-000909

                        1



DEFENDANT'S
EXHIBIT
   A

1                              INDEX

2

3     Date of Hearing:   February 21, 2002

4     Pages:             1 through 23

5

6     Witness                    Direct Cross Redirect Recross

7     Det. Thomas Kelly           4      11      21

8     Continued to 3-18-02       22

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

```
 1              THE CLERK:  People versus Mikel Pernell.

 2              MR. SMITH:  Gregg Smith on behalf of Mikel

 3         Pernell.

 4              Judge, I filed a Motion to Quash Arrest

 5         and Suppress Evidence.  It's my motion.  One of the

 6         three officers that I subpoenaed is here today.

 7         I'm requesting that we put this officer on and then

 8         enter and continue the matter for me to bring in

 9         the other two officers.

10              MR. BROGAN:  Your Honor, Raymond Brogan,

11         B-R-O-G-A-N.

12              Judge, this is a Motion to Quash Arrest.

13         I will stipulate the Defendant was not violating

14         any criminal laws or there was not a warrant for

15         his arrest at the time of the arrest.

16              THE COURT:  Okay.

17              MR. SMITH:  We would agree to that

18         stipulation.

19                        (Witness Sworn.)

20

21

22

23

24
```

```
 1                    DETECTIVE THOMAS KELLY,

 2      called as a witness on behalf of the People of the

 3      State of Illinois, on the Motion, having been first

 4      duly sworn, was examined and testified as follows:

 5                    DIRECT EXAMINATION

 6                    BY

 7                    MR. RAYMOND BROGAN:

 8           MR. BROGAN:   Q   Would you state your name?

 9           THE WITNESS:  A   Detective Thomas Kelly,

10      K-E-L-L-Y, Star No. 20229.

11           Q    You're a member of the Chicago Police

12      Department?

13           A    Yes.

14           Q    How long have you been a Chicago Police

15      Officer?

16           A    33 years.

17           Q    On June 22nd, 2002, were you working?

18           A    Yes.

19           Q    Where were you working at?

20           A    I was working as a detective assigned to

21      Area 1 Violent Crimes at 51st and Wentworth.

22           Q    What watch did you work on that

23      particular day?

24           A    The third watch, which is approximately
```

4

1    4:30 p.m. to 1:00 a.m.

2        Q    Now, that particular date, did you have

3    occasion to go to Ogden Park located at 63rd Street

4    and Ada in Chicago?

5        A    Yes, sir.  To be a little more accurate,

6    it was 64th and Ada.

7        Q    Approximately what time did you arrive

8    at that particular location?

9        A    Approximately 8:00 p.m.

10       Q    In particular regarding that park, was

11   there a certain area that you went to there?

12       A    I went to the area which was adjacent to

13   the basketball courts.

14       Q    What was your purpose in going to that

15   location?

16       A    I had been assigned to go to that

17   location in regard to two persons shot on or near

18   the basketball courts in Ogden Park.

19       Q    While you were at that location, did you

20   learn the names of two people that were shot?

21       A    Yes.

22       Q    What were the names of those people?

23       A    Gregory and Melvin Phillips.

24       Q    While you were at that location, did you

5

1    talk to any other police officers?

2         A    I talked to several other police

3    officers, yes.

4         Q    Did they give you information about what

5    had happened?

6         A    Yes, they did.

7         Q    Could you tell us what you were told by

8    your fellow officers?

9         A    I was informed that the two persons who

10   had been shot, Gregory and Melvin Phillips, were

11   near the basketball courts.  I was also informed

12   prior to my arriving there they had been taken by

13   ambulance to hospitals.  I was told that the

14   offenders were four male Blacks in their late teens

15   to early twenties.  They were known as Dave, Wild

16   Bill, Tony, and Mikel.

17        Q    Did you learn what time the shooting had

18   happened at?

19        A    The shooting had occurred shortly after

20   6:00 p.m.

21        Q    Now, the four names that you gave, were

22   those names the victim had given to the police

23   officer as the shooters in the case?

24        A    Yes.

                              6

1    Q    While you were at that location, did you --
2    by the way, did you learn how the offenders had
3    arrived at the location of the shooting?

4    A    The offenders had arrived in
5    automobiles.

6    Q    While you were at that particular
7    location, was there any physical evidence you
8    observed?

9    A    I observed three groups of shell
10   casings, .9 millimeter shell casings.  They were at
11   1320 West 64th Street.  There were multiple casings
12   at 13, I believe, 37 West 64th Street.  There was
13   also multiple shell casings.  And at 1332 West 64th
14   Street next to a parked 1981 blue Chevy Malibu,
15   there was one .9 millimeter casing.  This casing
16   was south of the parked auto on the north side of
17   the street.

18   Q    All those casings that you described,
19   were they adjacent to the basketball playing area
20   there?

21   A    Yes, sir.

22   Q    While you were at that location, you
23   mentioned that there was a Chevy Malibu, a casing
24   by there?

```
 1          A      Yes, correct.

 2          Q      When you were at that location, did

 3   anyone approach you?

 4          A      A man and a woman approached.

 5          Q      Did they identify themselves?

 6          A      At that particular moment, I don't

 7   believe that they identified themselves, no.

 8          Q      Did they say who they were or why they

 9   approached?

10          A      They approached and told me that they

11   had heard there had been a shooting at Ogden Park.

12   They then told me that the 1981 Chevrolet Malibu

13   was their son's car.  I then asked them at the time

14   what their son's name was, and they said his name

15   was Mikel Pernell.

16          Q      After you talked to those people, did

17   you continue to remain at the location by that car?

18          A      Yes, I did.

19          Q      Did anyone else approach you at that

20   time?

21          A      Shortly thereafter, a female Black,

22   approximately 18 to 20 years of age, approached me.

23   She told me that the 1981 Chevrolet Malibu was her

24   brother's car.  I asked her what her brother's name
```

8

1    was.  She told me it was Mikel Pernell.  She asked
2    me -- she had keys to the car.  She asked me if she
3    could remove the car from the area, and I told her
4    she couldn't.
5              Q    Did she then leave?
6              A    Yes.
7              Q    Now calling your attention to
8    approximately 9:30 p.m.  Were you still at that
9    location of the car?
10             A    Yes.
11             Q    Did anyone else approach at that time?
12             A    A person I now know to be Mikel Pernell
13   approached.
14             Q    Do you see that person in court?
15             A    Mr. Pernell has --
16         MR. SMITH:  We'll stipulate to in-court
17   identification of the Defendant.
18         MR. BROGAN:  I will accept that.
19         THE COURT:  All right.
20         MR. BROGAN:  Q   When he approached at this
21   time, did you have a conversation with him?
22         THE WITNESS:  A   Yes, I did.
23             Q    Would you tell us what he said?
24             A    He told me that the car, the '81 Chevy

```
 1        Malibu, was his, and that he had lent it to a

 2        friend sometime earlier in the day.

 3             Q    Did he have any keys to that automobile?

 4             A    Yes, he did.

 5             Q    Now, did you ask him that, or how did

 6        that come up?

 7             A    That was voluntary on his part.

 8             Q    He told you what his name was, is that

 9        correct?

10             A    Yes, he did.

11             Q    And he said his name was Mikel Pernell?

12             A    Yes.

13             Q    Did you have a further conversation with

14        him about the woman who had approached the car

15        earlier?

16             A    I told him that a female had just come

17        up and said it was his sister, Pernell's sister,

18        and that she wanted to take the car from the scene.

19        I told her she couldn't take the car.  At this

20        time, Pernell told me that it really wasn't his

21        sister, it was his girlfriend, and he had sent her

22        up there to try to get the car out of the area.

23             Q    Was he placed under arrest at that time?

24             A    Yes.
```

10

```
 1              MR. BROGAN:  If I can have one moment, Your

 2    Honor?

 3              I have no further questions.

 4                         CROSS EXAMINATION

 5                         BY

 6                         MR. GREGG SMITH:

 7         MR. SMITH:  Q   Detective, you said that the

 8    victim, the Phillips boys, they gave the name of

 9    Mikel?  That is what you learned in your

10    investigation?

11         THE WITNESS:  A   Yes, sir.

12         Q    You didn't learn any description of

13    Mikel Pernell, did you?

14         A    I received what I would call general

15    description of a male Black, late teens, early

16    twenties.

17         Q    No clothing description?

18         A    Not that I recall.

19         Q    No height or weight, nothing other than

20    just male Black and estimated age; correct?

21         A    Yes, sir.

22         Q    Now, you received this information from

23    talking to the Phillipses themselves, or did you

24    talk to the beat cops who took statements from the
```

1    Phillipses?

2         A    Both of the Phillips.  I believe they

3    were brothers.  Both Phillip brothers were gone

4    when I got there.  It's from my conversation with

5    the beat officers.

6         Q    And those beat officers, your memory, if

7    you're able to remember, was Officers Dobson and

8    Tucker; is that correct?

9         A    That is correct.

10        Q    They didn't have any particular spelling

11   of the name Mikel for you, nor did they have the

12   last name to go with the name Mikel; is that right?

13        A    Correct.

14        Q    You didn't know if Mikel was a nickname

15   or first name, middle name or last name; right?

16        A    That is correct.

17        Q    Now, you told Judge Sumner that when you

18   arrived on the scene at Ogden Park, you were able

19   to observe three areas where there were shell

20   casings; correct?

21        A    Yes, sir.

22        Q    The first area was 1320 West 64th

23   Street?

24        A    Yes, sir.

1    Q    Were the shell casings in the street or

2    in the park, grass, if you can recall?

3        A    I would have to look at the evidence

4    report.

5        Q    Do you recall the particular area of

6    1337 West 64th Street?

7        A    Again, I would have to look at the

8    evidence report.

9        Q    But do you recall that at 1332 West 64th

10   Street, there was one shell casing?

11       A    Yes.

12       Q    Where was that shell casing in relation

13   to that address?  Do you recall if it was on the

14   street, in the park, on the sidewalk, or walkway,

15   where?

16       A    My recollection is that the Malibu

17   automobile that I mentioned earlier was parked on

18   the north side of the street at approximately 1332.

19   The shell casing was, I believe, on the street

20   south of the automobile.

21       Q    How far south, Detective?

22       A    That I can't tell you without refreshing

23   my memory.

24       Q    To the best of your recollection, there

13

1     was no statements by anyone you talked to, whether

2     it be beat cops or witnesses, that mentioned that

3     Chevy Malibu was involved in any way, shape, or

4     form in the shooting at that park; is that correct?

5          A     Yes, sir.

6          Q     Do you recall if at 1320 West 64th

7     Street or at 1337 West 64th Street there were cars

8     parked in that area?

9          A     I believe there were.

10         Q     Were you monitoring those cars to see

11    who would come to try and drive them away?

12         A     No.

13         Q     Do you recall how far away the shell

14    casings were from this vehicle at 1320 West 64th

15    Street?  Do you recall the distance or where in

16    relation to the vehicles?

17         A     No.

18         Q     What about 1337 West 64th Street?

19         A     No.

20         Q     You stated that two people had come up

21    and asked you -- strike that.

22               A male and female had come up to you and

23    asked if there was a shooting at Ogden Park?

24         A     I believe they were aware that there

```
 1    had been a shooting.

 2        Q    And they indicated to you that that

 3    vehicle belonged to their son, the 1981 Chevrolet

 4    Malibu?

 5        A    Yes.

 6        Q    Did you attempt to detain them at this

 7    time or to ask them to locate their son for you?

 8        A    No.

 9        Q    You stated that they left, they were

10    allowed to leave the scene, and then a young man

11    approached you sometime later?

12        A    They were never kept at the scene.

13    Certainly they were free to go.

14        Q    But after they left a short time later,

15    a young lady approached you?

16        A    Yes.

17        Q    A female Black, correct?

18        A    Correct.

19        Q    She had the keys to the vehicle?

20        A    Yes, sir.

21        Q    And she was attempting to get into that

22    car and remove that car from the premises, is that

23    safe to say?

24        A    She never actually got in the car.  That
```

1    was her purpose of being there.  That's what she
2    expressed to me.
3         Q    And you refused to let her take that
4    vehicle, is that correct?
5         A    Correct.
6         Q    She indicated to you that she had the
7    keys to the vehicle?
8         A    She indicated she had the keys, and she
9    also indicated it was her brother's car.
10        Q    She indicated she had permission from
11   her brother?
12        A    I think it was inferred.
13        Q    How much later did Mr. Pernell come to
14   the scene and ask about the vehicle?
15        A    Maybe 15 minutes later.
16        Q    Was the young lady still there?
17        A    There was a lot of people there.  She
18   wasn't directly with him.  She may have been a half
19   a block away.  I don't know.  She didn't approach
20   with him, no.
21        Q    When you saw Mikel, did you ask him to
22   identify himself?
23        A    I believe he came up to me, as I recall,
24   and said that I had his car, and I said, "What's

16

1    your name?" And he told me his name was Mikel
2    Pernell.

3         Q    Did you ask him anything else?
4         A    I believe he asked me at the time if he
5    could take his car and remove it.

6         Q    Well, when he identified himself as
7    Mikel Pernell, you didn't place him under arrest at
8    that moment; correct?

9         A    Within moments, yes.

10        Q    Well, you told the Court that he had
11   some conversation with you about who this girl was
12   and how the car got to the park, is that right?

13        A    Yes.

14        Q    And it was only after that that you
15   arrested him, is that correct?

16        A    Yes.

17        MR. SMITH:   May I have one moment, Judge?
18        THE COURT:   Yes.

19        MR. SMITH:   Q   Detective, getting back to how
20   the beat officers were able to get the name of
21   Mikel, do you know who they spoke with besides the
22   Phillip brothers to get that name Mikel?

23        THE WITNESS:   A   No, I don't.

24        Q    Were you informed that that was the only

17

1       source of the name Mikel?

2               A       My recollection is that they told us

3       they had spoke to the victims, who would be the

4       Phillips brothers, I believe.  If they spoke to

5       someone else -- they may have.  I don't know.

6               Q       Did they inform you as to whether they

7       learned that Mikel was at the park when the

8       shooting occurred or a participant in the shooting

9       when it occurred?

10              A       My recollection is that he was

11      described, Mikel was described as one of the

12      offenders.

13              Q       No particular indication of any actions

14      that he took besides just that he was an offender?

15              A       Offender is the word that I recall.

16              Q       No information whether he had a gun in

17      his hand?

18              A       I don't recall at that particular moment

19      knowing that.

20              Q       And the shooting incident at Ogden Park

21      occurred about 6:10 p.m. on June 10th, the year

22      2000; correct?

23              A       Yes.

24              Q       My client was arrested at 1324 West 64th

                                18

1    Street at 9:30 p.m., correct?

2         A    Yes, sir.

3         Q    That was on June 27th, 2000, right?

4         A    Yes.

5         Q    Chicago, Cook County, Illinois?

6         A    Yes, sir.

7         MR. SMITH:  Judge, I have nothing further of

8    this witness.

9         MR. BROGAN:  I have no redirect, Judge.

10        THE COURT:  Detective, you said that the young

11   lady that approached you, she told you that the

12   car, that the car belonged to her brother; is that

13   right?

14        THE WITNESS:  Yes, sir.

15        THE COURT:  She didn't get in the car?

16        THE WITNESS:  No, she didn't.

17        THE COURT:  But she said she had keys, right?

18        THE WITNESS:  She had keys in her hand.

19        THE COURT:  Did she ever try to get in the

20   car?

21        THE WITNESS:  The whole area, including the

22   particular car, was cordoned off.

23        THE COURT:  So then she really didn't get a

24   chance to try to get in the car, correct?  She was

1    stopped?

2            THE WITNESS:  Yes.

3            THE COURT:  So she didn't have a chance to try

4    to get into the car, is that right?

5            THE WITNESS:  That is correct.

6            THE COURT:  So basically this was a

7    conversation that you had with her where she said

8    the car belonged to her brother and can she take

9    the car, and you said no, in essence; right?

10           THE WITNESS:  Yes, sir.

11           THE COURT:  You said the Defendant came up

12   about 15 minutes later?

13           THE WITNESS:  Yes.

14           THE COURT:  After the conversation with the

15   young lady?

16           THE WITNESS:  Yes.

17           THE COURT:  I take it you were still near the

18   automobile or something at that time, is that

19   right?

20           THE WITNESS:  Yes, sir.

21           THE COURT:  And he identified himself and said

22   that the car was his?

23           THE WITNESS:  Yes, sir.

24           THE COURT:  And he wanted to move the car?

```
1            THE WITNESS:  Yes, sir.

2            THE COURT:  Anything else?

3            MR. BROGAN:  I just want to ask one question.

4                         REDIRECT EXAMINATION

5                         BY

6                         MR. BROGAN:

7            MR. BROGAN:  Q    When the woman who said she

8       was -- that was her brother's car, she gave her

9       brother's name as Mikel Pernell; is that correct?

10           THE WITNESS:  A    Yes, sir.

11           MR. BROGAN:  No further questions.

12           THE COURT:  Anything else?

13           MR. SMITH:  No, Judge.

14           THE COURT:  Thank you.  You're excused.

15                         (Witness Excused.)

16           MR. SMITH:  Judge, at this juncture, the

17      Petitioner would request we continue this.  I can

18      try to bring in the beat officers.

19           THE COURT:  Where are they?  Were they

20      subpoenaed?

21           MR. SMITH:  I believe they were subpoenaed for

22      the last date.  The Court was on a jury trial.

23           THE COURT:  Do you have the names of the

24      officers?
```

```
 1              MR. SMITH:  Dobson and Tucker.

 2              MR. BROGAN:  Maybe I can stipulate to

 3         something, if possible.

 4              THE COURT:  Well, that's between the two of

 5         you.

 6              MR. SMITH:  Can we pass this briefly, Judge?

 7              THE COURT:  We are going to take a lunch.  We

 8         can pass it for an hour.

 9              MR. BROGAN:  Maybe we can get this a date.

10         We'll talk about it.

11              THE COURT:  Okay.

12              MR. SMITH:  How does March 13th sound?

13              THE COURT:  How is the 14th?

14              MR. SMITH:  I have a motion before Judge

15         Coughlin on a predatory case.

16              THE COURT:  How is the 18th?

17              MR. SMITH:  I have a trial in front of Judge

18         Lacy.

19                   I think we can do it on that date.

20              THE COURT:  All right.  Let's do it on the

21         18th.

22                                  (Which were all the

23                                   proceedings were had

24                                   on this date.)
```

```
1    STATE OF ILLINOIS )
                        ) SS
2    COUNTY OF C O O K )

3

4              I, JAMES M. DONAHUE, an Official Court

5    Reporter for the Circuit Court of Cook County,

6    County Department-Criminal Division, do hereby

7    certify that I reported in shorthand the

8    proceedings had in the above-entitled cause; that I

9    thereafter caused the same to be transcribed into

10   typewriting; which I certify to be a true and

11   accurate transcription of the proceedings had

12   before the Hon. Thomas R. Sumner, Judge of said

13   Court, on the 21st day of February, A.D., 2002.

14

15                         _____
                           Official Court Reporter
16                         Circuit Court of Cook County
                           Criminal Division
17                         Certificate No. 084-000909

18

19

20

21

22

23

24
```

23

STATE OF ILLINOIS    )
                     )    SS:
COUNTY OF COOK       )

       IN THE CIRCUIT COURT OF COOK COUNTY
       COUNTY DEPARTMENT-CRIMINAL DIVISION

MIKEL PERNELL,         )
      Petitioner,  )    No. 00-CR-18362
                       )
    -vs-             )
                       )    Charge: Murder
                       )
THE PEOPLE OF THE      )
STATE OF ILLINOIS,     )
      Respondent.  )

            MOTION TO QUASH ARREST

             SUPPRESS EVIDENCE

    Report of Proceedings of the above-entitled motion

heard before the Honorable THOMAS SUMNER on May 6,

2002.

    APPEARANCES;

        MR. GREGG SMITH,
           appeared on behalf of the Petitioner;

        HONORABLE RICHARD A. DEVINE,
           State's Attorney of Cook County, by
        MR. RAYMOND BROGAN,
           Assistant State's Attorney,
           appeared for the Respondent.

DEFENDANT'S
EXHIBIT
_B_

1    THE CLERK:  Mikel Pernell.

2    MR. SMITH:  Your Honor, again Gregg Smith on

3    behalf of Mikel Pernell present before the bench in

4    custody.  Family is also present here in open court.

5           Judge, this was a commenced and continued

6    motion to quash arrest, suppress evidence.  The

7    petitioner has a rebuttal witness, Melvin Phillips.

8    THE COURT:  Okay.

9    MR. BROGAN: Ray Brogan, B-R-O-G-A-N.

10          If I haven't done it on the last date, I am

11   resting on the motion.

12   THE COURT:  Okay.  You can have a seat.

13   MR. SMITH:  Thank you, Judge.

14          Judge, we will be asking Melvin Phillips be

15   brought out.

16   THE COURT:  Where is he?

17   THE SHERIFF:  He is in custody in the lockup.

18   THE COURT:  Okay.

19                (Witness sworn.)

20   MR. SMITH:  May I proceed, Judge?

21   THE COURT:  Yes

22                MELVIN PHILLIPS,

23   called as a witness on behalf of the Petitioner,

24   having been first duly sworn, was examined and

testified as follows:

                    DIRECT EXAMINATION

                    BY: MR. SMITH

        Q.   Mr. Phillips, please state your full name and
spell your name for the Court.

        A.   Melvin Phillips, M-E-L-V-I-N,
P-H-I-L-L-I-P-S.

        Q.   Million, how old are you?

        A.   Twenty.

        Q.   And I want to call your attention back to
June 27th, year 2000.  Do you recall that date and
that year?

        A.   Yes.

        Q.   I want to direct you to about 6:00 o'clock,
5:30 p.m.  Do you recall the time?

        A.   Yes.

        Q.   Tell the Judge where you were at that time?

        A.   At Ogden Park, 64th and Avers (sic).

        Q.   And were you with any people in Ogden Park at
that date and time?

        A.   No, I was up there playing basketball.

        Q.   Who were you playing with?

        A.   Several people.

        Q.   Any friends or family members?

```
 1      A.   No, just friends from the park that I knew

 2   who be up there playing.  Who I seen, I don't actually

 3   know their names, but who I seen several times.

 4      Q.   Do you know a Gregory Phillips?

 5      A.   Yes.

 6      Q.   Who is that?

 7      A.   My uncle.

 8      Q.   How old is he?

 9      A.   Thirty-one.

10      Q.   Was he in the park at that time also?

11      A.   Yes.

12      Q.   On that date, right?

13      A.   Yes.

14      Q.   Was he playing basketball with you?

15      A.   No.

16      Q.   He was just --

17      A.   When I was playing ball, he happened to come

18   up there when I was playing ball.

19      Q.   Now did anything unusual happen at about ten

20   after six on June 27th, year 2000?

21      A.   Yeah.

22      Q.   What happened?

23      A.   Shooting.

24      Q.   A shooting?
```

4

```
1      A.   Yeah.

2      Q.   Did you see who was shot?

3      A.   Did I see who got shot?

4      Q.   Yeah?

5      A.   Yeah.

6      Q.   Who?

7      A.   I got shot; my uncle got shot.

8      Q.   Your uncle, meaning Gregory Phillips?

9      A.   Yes.

10     Q.   Did you see who did the shooting that day?

11     A.   Yes.

12     Q.   Do you know a Mikel Pernell?

13     A.   No. Seen him around, I didn't know his name

14   until now.

15     Q.   Okay.  You were just back in the lockup,

16   correct?

17     A.   Yes.

18     Q.   Were you in the same lockup area as Mikel

19   Pernell?

20     A.   Yes.

21     Q.   Do you know what he looked like now?

22     A.   Yes.

23     Q.   Do you know his name?

24     A.   Mikel, yeah.
```

1    Q.    Do you see him here in open court?

2    A.    Yes.

3    Q.    Would you please point to him and state an

4    article of clothing he is wearing.

5    A.    Brown DOC.

6    MR. SMITH:  Ask for in-court identification of the

7    petitioner, Judge.

8    THE COURT:  All right.

9    MR. SMITH: Q.    Now do you recall back on June

10   27th, year 2000 about 6:00 o'clock p.m. seeing Mikel

11   Pernell in Ogden Park?

12   A.    No.

13   Q.    Are you certain he wasn't there?

14   A.    I didn't see him, positive that I didn't see

15   him there.

16   Q.    Did you see who was doing the shooting? --

17   A.    Yes.

18   Q.    -- at Ogden Park where you were shot?

19   A.    Yes.

20   Q.    Who did you see do the shooting?

21   A.    Anthony Hicks, David Valentine.

22   Q.    Anyone else?

23   A.    A friend of theirs, Billy Spencer was there,

24   but he wasn't part of the shooting.  He was there with

6

1    them.

2         Q.    Now after you were shot, did you have an

3    opportunity to speak to Chicago Police Officers?

4         A.    No, because I had went straight to the

5    hospital.

6         Q.    Tell the Judge what hospital you went to?

7         A.    It's located on 64th and Harvard.  I don't

8    know the exact name.  I think it's -- St. Bernard, if

9    I ain't mistaken.

10        Q.    St. Bernard's Hospital, correct?

11        A.    Yeah.

12        Q.    Did you ever talk to Chicago Police Officer

13   Dobson or Tucker after, say, 6:30 p.m. on June 27th,

14   2000?

15        A.    I don't actually know they names, but it was

16   several homicide came and talk to me while I was in

17   the  hospital.

18        Q.    And that was at St. Bernard's, correct?

19        A.    It was a couple of officers came at St.

20   Bernard's, but they shipped me to Cook County

21   Hospital.

22        Q.    When you were at St. Bernard's, did you speak

23   with any of the officers about what happened at the

24   park specifically?

| | |
|---|---|
| 1 | A.   Yeah. |
| 2 | Q.   Were these uniform or plain clothes officers? |
| 3 | A.   Plain clothes. |
| 4 | Q.   Plain clothes officers? |
| 5 | A.   Yes. |
| 6 | Q.   Do you remember if it was a Detective Kelly |
| 7 | or McNeeley? |
| 8 | A.   I probably wouldn't know them unless I see |
| 9 | them.  I don't know they names. |
| 10 | Q.   Did you discuss with them what you observed |
| 11 | and witnessed in the park when you were shot? |
| 12 | A.   That-- I told them who shot me; that was it. |
| 13 | Q.   Did you ever tell them Mikel -- the name |
| 14 | Mikel or Mikel Pernell at any time that evening? |
| 15 | A.   Not -- no, not pacific (sic) that day.  But |
| 16 | as I went to Cook County, yeah, I had mentioned his |
| 17 | name. |
| 18 | Q.   Okay.  When you went to Cook County Jail or |
| 19 | Cook County Hospital? |
| 20 | A.   Hospital. |
| 21 | Q.   Who were you talking to when you mentioned |
| 22 | Mikel's name? |
| 23 | A.   It was the homicides, they came up there and |
| 24 | talked to me; they showed me several pictures.  And |

8

1   they say my uncle had implicated Mikel name.  So I had

2   went along with it, but at the time I had not seen

3   them, my uncle say he was up there.  So --

4       Q.   But did you see Mikel Pernell?

5       A.   No, I didn't see him.

6       Q.   Did you ever tell the police that you saw him

7   and he was one of the shooters?

8       A.   Yeah.  I think I -- yes, I think.

9       Q.   You did tell them that?

10      A.   Yeah.

11      Q.   When?

12      A.   When I was at Cook County Hospital.

13      Q.   Did you tell them after they told you what

14  Gregory Phillips told them?

15      A.   Yeah.  Because at first I didn't even know he

16  was there, I had not seen him 'til my -- they told my

17  uncle say he was involved in it.

18      Q.   Now can you describe these officers who told

19  you what Gregory Phillips said?

20      A.   Skinny, white, there was one -- it was

21  several white homicides came up there and talked to

22  me.

23      Q.   Cook County Hospital?

24      A.   Yeah. They kept sending different homicides

1    like every day. I was there like six days, and each

2    time I was there, was like different homicides coming

3    up there.

4        Q.    Do you recall about the time you spoke to

5    them at Cook County Hospital?

6        A.    No.

7        Q.    But just so we are clear, you never spoke to

8    any officers at the park, correct?

9        A.    Yes.

10       Q.    And when you were at St. Bernard, you were

11   there for a little while, correct?

12       A.    Yes.

13       Q.    You never mentioned Mikel Pernell's name,

14   right?

15       A.    No.

16       MR. SMITH:  Nothing else, Judge.

17                   CROSS EXAMINATION

18                   BY:  MR. BROGAN:

19       Q.    You are in custody in Cook County Jail right

20   now, correct?

21       A.    Yes.

22       Q.    And you are in the same jail that Mikel

23   Pernell is in, is that correct as well?

24       A.    Yes.

```
1       Q.   And Mikel Pernell was back in the lockup with
2    you right before you came out, is that correct?
3       A.   Yes.
4       Q.   Did you talk to him?
5       A.   Yes.
6       Q.   And you are a member of the Black P Stone
7    street gang, is that correct as well?
8       A.   Yes.
9       Q.   And Mikel Pernell, David Valentine, Anthony
10   Hicks and William Spencer, they are also members of
11   the same street gang that you belong to, is that
12   correct as well?
13      A.   David, Anthony and Billy, I don't actually --
14   he was back then, I don't know about now.
15      Q.   Okay.  But back then when you got shot, both
16   of you were in the same street gang, correct?
17      A.   Yeah.
18      Q.   And you are still in that gang now?
19      A.   Yes.
20      Q.   Is that correct?
21      A.   I am.
22      Q.   Now when you were over at the park -- or
23   strike that.  Let me ask you this question.
24              You said -- you did say Mikel Pernell was
```

1    one of the people that shot you to the police, is that
2    right?
3        A.   Yes.
4        Q.   And did you tell him yeah, that's his name,
5    Mikel Pernell?  Give the name?
6        A.   I said Mikel, I didn't know his last name.
7        Q.   And what context did that come up in where
8    you mentioned his name?
9        A.   When homicide came up there, they showed me
10   the statement that my uncle and the picture of Mikel.
11       Q.   They showed you a statement?
12       A.   Yeah, that my uncle had.  And they say
13   --because at first I just thought it was the three
14   guys.  And then my uncle had implicated his name.
15       Q.   Well, when the police came to talk to you,
16   your uncle wasn't there when you mentioned Mikel's
17   name?
18       A.   No, he wasn't there.
19       Q.   Did any police ask you hey, what happened?
20       A.   Yeah.
21       Q.   When did that happen?
22       A.   When I was at Cook County Hospital and St.
23   Bernard's.  They asked me questions at both of the
24   hospitals.

1    Q.   When you were over at St. Bernard's Hospital,

2    the police came and talked to you, correct?

3    A.   Yeah.

4    Q.   And your uncle wasn't there, was he?

5    A.   No.

6    Q.   And you told two police officers that came to

7    talk to you then that the people that shot you were

8    Tone, Wild Bill, Dave and Mikel, correct?

9    A.   No, I never mentioned his name at St.

10   Bernard's, not until we got to Cook County.

11   Q.   Not until you got to Cook County?

12   A.   Hospital.

13   Q.   And what time was it when you got to Cook

14   County Hospital that you did mention his name?

15   A.   I was there for like a day.  I don't know

16   exactly what time it was.

17   Q.   Now you are telling us you didn't see him at

18   Ogden Park?

19   A.   Right.

20   Q.   When you mentioned his name, what did you say

21   about him?

22   A.   Well, when they showed me my uncle's

23   statement, at first they asked -- they asked me who

24   was up at the park, some dude shooting.  I told them

1   three people. And then they told me well, here go a

2   picture of a person name Mikel; your uncle say he was

3   there. So I'm like he must have been there if my

4   uncle seen him.

5       Q.   Do you recall testifying at the grand jury on

6   the date of 19 July of the year 2000 in this building?

7       A.   Yes.

8       Q.   Do you recall being sworn to tell the truth

9   in the grand jury?

10      A.   Yes.

11      Q.   And do you recall being asked questions and

12  giving answers?

13      A.   Yes.

14      Q.   And your uncle wasn't there at that time, was

15  he, in the grand jury with you, was he?

16      A.   Yes, he was -- he wasn't in the grand jury,

17  but he went that day.

18      Q.   On that same day?

19      A.   Yeah. If I ain't mistaken, yeah. He went

20  the same day I was.

21      Q.   Did you testify before that grand jury in the

22  following manner, page eight: Question: "Okay. Now

23  you say Tone ended up shooting at you and he hit you,

24  is that right?" Answer: "Yes".

1      Question: "Now was anyone else shooting?"

2  Answer: "Yes."

3      Question: "Who else was shooting?" Answer:

4  "Dave and Mikel."

5      MR. SMITH: Judge, I object, it's not impeaching.

6  The defendant did state that he changed and went along

7  with what his uncle said later at Cook County Hospital

8  I don't believe that's impeaching.

9      MR. BROGAN: It's impeaching his account of who was

10  shooting at the park, your Honor.

11      THE COURT: Objection will be overruled.

12      MR. BROGAN: Q. Did you give those answers to

13  those questions on the date of July 19th of the year

14  2000 before the grand jury?

15      A. Yes.

16      Q. Can I just have one moment, your Honor.

17      MR. BROGAN: I don't have any further questions.

18      THE COURT: You may.

19              REDIRECT EXAMINATION

20              BY: MR. SMITH:

21      Q. Melvin, how long were you at St. Bernard's

22  Hospital, if you can estimate, before you were brought

23  to Cook County Hospital on June 20th?

24      A. About an hour before they shipped me to Cook

1    County Hospital.

2        Q.    And how long were you at Cook County Hospital

3    before the officers spoke to you about what your uncle

4    had said?

5        A.    They came-- I was there -- they came the same

6    day I went to Cook County.

7        Q.    Was it evening, was it the next morning?

8    When was it?

9        A.    It was kind of a little bit late like.  I

10   don't know exactly what time.  It was late though.

11       Q.    Towards 10:00 o'clock that evening, 12:00

12   o'clock that evening?

13       A.    Probably about around ten.  I can't really

14   give you no exact time.  I don't remember what exact

15   time they came.

16       Q.    When you first spoke to the officers at St.

17   Bernard's, you never gave Mikel's name, correct?

18       A.    No.

19       Q.    And it wasn't until around 10:00 o'clock or

20   so that --

21       A.    When I went to Cook County.

22       Q.    You went along as you said with what your

23   uncle said about Mikel, is that right?

24       A.    Yeah.

16

| 1 | MR. SMITH: I have nothing else, Judge. |
| 2 | THE COURT: Anything else? |
| 3 | MR. BROGAN: Just one second. |
| 4 | RECROSS EXAMINATION |
| 5 | BY: MR. BROGAN: |
| 6 | Q. You say that the police showed you a |
| 7 | statement that your uncle had made, and that's why you |
| 8 | went along with it, correct? |
| 9 | A. Yeah. |
| 10 | Q. That's a statement your uncle signed? |
| 11 | A. Yes. |
| 12 | Q. Showing you what I will mark as Respondent's |
| 13 | Exhibit Number 1. That's the statement of your uncle |
| 14 | Greg? |
| 15 | THE COURT: Well, let him tell what you it is. |
| 16 | MR. BROGAN: Q. Do you recognize what that is? |
| 17 | A. Yes. |
| 18 | Q. What is it? |
| 19 | A. A statement. |
| 20 | Q. Of who? |
| 21 | A. Gregory Phillips. |
| 22 | Q. And that has Gregory Phillips' signature on |
| 23 | it as well, correct? |
| 24 | A. Yes. |

1      Q.   Now it shows the date that statement was

2   taken as well, correct?

3      A.   Yes.

4      Q.   What date does it say it was taken?

5      A.   June 30, 2000.

6      Q.   You got shot an June 27th, correct?

7      A.   Yes.

8   MR. BROGAN: I have no further questions.

9   MR. SMITH:  I have a question, Judge.

10  THE COURT:  Um-hum.

11                  REDIRECT EXAMINATION

12                  BY: MR. SMITH:

13     Q.   This is a statement that they showed you when

14  you were at the hospital, right?

15     A.   Yes.

16     Q.   So when showed you the statement, the picture

17  of Mikel Pernell it was actually June 30th, year 2000,

18  not the same date that you were shot?

19     A.   I don't know exactly what day it was.  They

20  came after the day.  I thought it was at the hospital,

21  though.  They came at Cook County the same day.  They

22  was coming every day.

23     Q.   You said when they showed you the statement--

24     A.   Um-hum.

18

1    Q.    They also showed you a picture of Mikel
2    Pernell?
3    A.    Yeah.
4    Q.    And they told you what your uncle had said,
5    correct?
6    A.    Yes.
7    Q.    And then that's when you said yeah, Mikel was
8    there, and you went along with your uncle, correct?
9    A.    Yes.
10    Q.    And the statement you just identified,
11    Respondent's Number 1, was dated June 30th, correct,
12    2000, right?
13    A.    Yes.
14    Q.    So it had to be June 30th or later, year 2000
15    when they showed you this, correct?
16    A.    Yes.
17    MR. SMITH:    Nothing else, Judge.
18    MR. BROGAN:    No further questions.
19    THE COURT:    Mr. Phillips, let me ask you a
20    question:    You just identified People's Exhibit Number
21    1 as your uncle's statement?
22    THE WITNESS:    Yes.
23    THE COURT:    Did you read that statement?
24    THE WITNESS:    No.

THE COURT:  Did you read it the day you saw it?

THE WITNESS:  No, they just --

THE COURT:  So how do you know it was your uncle's statement?

THE WITNESS:  I saw his name.

THE COURT:  So when you saw his name, you assumed that was his statement, is that right?

THE WITNESS:  Yes.

THE COURT:  You don't know that was his statement, do you?

THE WITNESS:  No -- his name was on there.

THE COURT:  Anything else?

MR. BROGAN:  No.

THE COURT:  You can step down.

(Witness excused.)

MR. SMITH:  Judge, may I approach?

THE COURT:  Yes.

(Whereupon, a discussion was had off the record between Court and counsel, after which the following proceedings were had:)

MR. SMITH:  Judge, at this time we'd be asking to have additional time to locate Gregory Phillips.  We have attempted to serve him; we have been unable to do

so.

We were able to locate Melvin Phillips; he was writted over and is here. I think Gregory Phillips is a relevant witness; we definitely need him and I would be asking for a date to bring him into court.

THE COURT: State.

MR. BROGAN: Judge, we are -- this motion has been pending awhile, your Honor, and we ask -- we are ready to finish it right now.

THE COURT: This motion has been going on since February.

MR. SMITH: Judge, Melvin Phillips when we eventually located him was at Cook County Jail.

THE COURT: Um-hum.

MR. SMITH: On a couple of occasions we tried to writ him over; we were unsuccessful. He was brought over today.

On the prior dates since February 21st, I was here; obviously my client was here and the State was ready to proceed. Mr. Phillips was not brought over by the Cook County Sheriff's Department.

THE COURT: Um-hum. Well, we are not talking about Melvin Phillips now, we are talking about

1    Gregory Phillips.

2        MR. SMITH: I understand that, he is a reluctant

3    witness, Judge. And he is an individual who I could

4    proffer has had numerous contacts with the law.

5        THE COURT: Counsel, let me say this: The fact

6    that you can't locate him--

7        MR. SMITH: I have an address on him, Judge, I

8    have been unable to have him served.

9        THE COURT: Like I said, the fact that you can't

10   locate him clearly demonstrates that he is reluctant.

11   I have no doubt that you have tried to serve him, but

12   I am not going to keep continuing this case in order

13   for you to try to locate him in light of the fact that

14   this motion started in February, and in light of the

15   fact that this is a 2000 case.

16            This case has been going on too long. And

17   furthermore, I know that you have been looking for him

18   before you started the motion in February.

19       MR. SMITH: I have been, Judge.

20       THE COURT: Absolutely. Because you wouldn't --

21   you wouldn't stand here as an attorney-- the fact of

22   the matter is that there is no way that you would

23   have just begun to look for Gregory Phillips in

24   February when the motion started in February.

So I know that you have not had much luck in locating this witness evidently. You have been diligent in trying to locate him.

Notwithstanding the fact that you believe he is an essential witness, I will not continue this case one more day in order to locate that witness.

MR. SMITH: I would then be asking the Court to allow me, in the event I am able to find him, to allow me to reopen this motion.

THE COURT: I will consider that at the appropriate time.

MR. SMITH: I would just make a record that we'd be asking for some additional time.

THE COURT: Okay. Denied.

MR. SMITH: With that, Judge, petitioner would be resting as well.

MR. BROGAN: I just have some brief rebuttal.

THE COURT: Okay.

MR. BROGAN: Call Officer Dobson.

(Witness sworn.)

GREGORY DOBSON,

called as a witness on behalf of the People of the State of Illinois, having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

2                    BY: MR. BROGAN:

3        Q.    Officer, will you please state your name for

4    the record?

5        A.    Officer Gregory Dobson.

6        Q.    How do you spell your last name?

7        A.    D-O-B-S-O-N.

8        Q.    You are a Chicago Police Officer?

9        A.    Yes.

10        Q.    Were you on duty June 27th of the year 2000?

11        A.    Yes.

12        Q.    On that particular evening, did you go to St.

13    Bernard's Hospital in connection with the

14    investigation of a shooting of Gregory and Melvin

15    Phillips?

16        A.    Yes.

17        Q.    Calling your attention to approximately 7:00

18    p.m., did you talk to an individual at the hospital by

19    the name of Melvin Phillips?

20        A.    Yes.

21        Q.    And was he being treated at that time?

22        A.    Yes, he was.

23        Q.    Did you ask -- for a gunshot wound, is that

24    correct?

```
 1        A.    Yes, he was.

 2        Q.    Did you ask Melvin Phillips who had shot him?

 3        A.    Yes.

 4        Q.    Did he give you names?

 5        A.    Yes, he did.

 6        Q.    What were the names?

 7        A.    Tone, McDell,(sic), Dave, and -- Mikel.

 8        Q.    Tone, Dave, Mikel-- did he give you another

 9   name?

10        A.    And Wild Bill.

11        Q.    Following your conversation with him, did you

12   go to another hospital?

13        A.    Yes.

14        Q.    And what hospital was that?

15        A.    Holy Cross.

16        Q.    Calling your attention to approximately 7:30

17   that evening, did you talk to an individual named

18   Gregory Phillips?

19        A.    Yes.

20        Q.    Did you ask him -- was he shot as well?

21        A.    Yes, he was.

22        Q.    Did you ask him who had shot him?

23        A.    Yes, I did.

24        Q.    What names did he give you?
```

```
 1        A.   Tone, Wild Bill, Dave and Mikel.

 2        MR. BROGAN: No further questions.

 3        THE COURT:  Cross?  Any questions?

 4                    CROSS EXAMINATION

 5                    BY:  MR. SMITH:

 6        Q.   Officer, when you spoke with Melvin Phillips,

 7   it was at St. Bernard's Hospital?

 8        A.   Yes.

 9        Q.   You said he was being treated for a gunshot

10   wound?

11        A.   Yes, he was.

12        Q.   Was anyone present with you when you spoke to

13   Melvin Phillips?

14        A.   Yes, would have been my partner.

15        Q.   What was your partner's name?

16        A.   Partner is Tucker.

17        Q.   First name?

18        A.   Brad.

19        Q.   And when you spoke to Melvin Phillips, and

20   you said he gave you these names, did he give you any

21   last names?

22        A.   No, he didn't.

23        Q.   Did he give you any descriptions?

24        A.   No, he didn't.
```

```
1        Q.   Did you talk to a Michael Norris, a Chris
2    Sanders or Craig Carter that evening?
3        A.   Yes.
4        Q.   They never gave you the name of Mikel, did
5    they?
6        A.   I can't recall.
7        Q.   But you recall that Melvin and Gregory
8    Phillips told you, is this it?
9        A.   Yes.
10       Q.   Gregory Phillips -- about what time did you
11   speak with him?
12       A.   It would probably have been about maybe an
13   hour after I spoke with Melvin.
14       Q.   What time did you speak to Melvin?
15       A.   Approximately maybe 6:45 or maybe 7:00
16   o'clock.
17       Q.   And Gregory Phillips gave you no descriptions
18   of the individuals, correct?
19       A.   Correct.
20       Q.   He gave you no last names?
21       A.   No, he didn't.
22       Q.   Did either one of those individual tell you
23   how they knew Mikel?
24       A.   No.
```

1    Q.   Did you know if the name Mikel was a first

2   last -- first name or last name?

3    A.   No.  I had no way of knowing.

4   MR. SMITH:  Can I have one moment, Judge?

5   THE COURT:  Yes.

6   MR. SMITH:  Nothing else, Judge.

7   MR. BROGAN:   No other questions.

8   THE COURT:  Please step down.

9                        (Witness excused.)

10   MR. BROGAN: Rest in rebuttal.

11   THE COURT:  Argument.

12   MR. SMITH:  Judge, the respondent's position is

13   that they have the name of Mikel by two individuals as

14   being linked to a shooting at the park; that for some

15   reason, Judge, they zero in on an automobile.

16          There is no testimony how they knew this

17   automobile belonged to anyone in particular relative

18   to the shooting.

19          They said that my client's parents and girl

20   friend tried to obtain the car, and then my client

21   later came to obtain the car.

22          Judge, even if these officers were given

23   the name Mikel, there was no description, no last

24   name, no mention of this type of vehicle.  And

1    moreover, Judge, they indicated that Officer Kelly--

2    Detective Kelly indicated that when he met Mikel

3    Pernell, there was no investigative stop, he

4    immediately arrested my client.

5              Did the officer who arrested Mikel Pernell

6    have reasonable suspicions to believe that he might

7    have been involved in committing a crime?  Yes.  Did

8    he have probable cause to arrest him and take him into

9    custody?  Absolutely not.

10             Judge, Melvin Phillips testified that he

11   never gave the name Mikel until the officer showed him

12   a statement by -- that the name Gregory Phillips was

13   on, his uncle. The State brought that statement in as

14   an exhibit, and that statement date was June 30th.

15             Now Melvin Phillips was suffering a gunshot

16   wound, Judge, maybe his memory isn't all that good.

17   But according to what the State put forth, Melvin

18   Phillips wasn't going along giving any name relating

19   to Mikel Pernell or the name Mikel until June 30th,

20   three days after the shooting.

21             Judge, there was no probable cause for this

22   arrest and we are asking it be suppressed.

23        MR. BROGAN: Judge, based upon the totality of the

24   facts and circumstances, there was probable cause to

29

1    arrest the defendant.  He is named as one of the

2    offenders, as one of the shooters by both of the

3    people that are shot, Greg and Melvin Phillips.

4               His car, if you recall, was parked over by

5    the area where a group of shell casings were.  You

6    also recall from the testimony that while the police

7    were at that car, a girl came up and there was this

8    ruse that went on.  The girl gets the keys and says I

9    want to move that car, I am the sister of Mikel

10   Pernell.

11              After that the defendant approaches

12   himself, he has the keys to the car, but says well, I

13   lent this car to a friend.  Then he says that girl

14   that approached, that wasn't my sister that was my

15   girl friend.

16              And they had every right at that point to

17   arrest him based on the totality of the circumstances

18   in the case.

19              That's all.

20         THE COURT:  Counsel.

21         MR. SMITH:  Judge, you heard the facts.  There is

22   three witnesses to this case.  What was said at the

23   park about the vehicle, which again, Judge was not

24   linked to anything, any shooting whatsoever.  There is

                        30

1   no testimony that these officers knew that this
2   vehicle belonged to anybody in particular.  They
3   didn't run a registration.  There is no mention of
4   that.

5          I think it's completely irrelevant what
6   happened between Mikel Pernell and the officer.  The
7   bottom line is there was no investigation.  Where were
8   you the last couple of hours, what occurred, you know,
9   that type of thing.  You didn't see that.  They
10  arrested him immediately.

11         And we are asking that you grant our
12  motion.

13  THE COURT:  Well, I suppose if I look at little
14  pieces of things in isolation that you would be right.
15  But in looking at the totality of the circumstances,
16  even with the conflicting testimony from Melvin
17  Phillips, the question isn't whether or not the police
18  had enough information to convict him, the question is
19  whether they had enough for probable cause to arrest
20  him.

21         I agree with you that incident with respect
22  to the car didn't really link the defendant to
23  anything.  The fact that the shell casings were found
24  near the car, so what.  That could have been any

random car on the street. I agree with that. The
fact that there was this ruse about a girl friend
versus sister, might make the police suspicious. But
that in and of itself doesn't mean that the police
have probable cause or even reasonable suspicion for
anything.

But this last witness that came out who
testified, Melvin Phillips, I'm not sure he knows what
happened. He got shot. He was at the hospital.
That's what he knows.

So for me to sit here to try to figure out
does he know what happened after he got shot. When
did he say this, when did he say that. I don't think
he knows what -- I don't think he knows. But I think
he did, as he admitted, did say that Mikel Pernell was
one of the people who shot him. Whether he said it on
the 27th after he saw a statement which he didn't read
and didn't know anything about, claims he saw his
uncle's signature and Mikel's picture, if that's
suppose to raise an issue in my mind as to whether or
not he said or when he said it, it didn't.

Motion to suppress will be denied.

MR. SMITH: Judge, there are statements in this
case, I am going to need to file a motion to suppress

1    those statements.

2        THE COURT:  I suggest you file those motions as

3    soon as possible, we are going to move real fast in

4    this case from here on forward.

5        MR. SMITH:  That's fine, Judge.

6        MR. SMITH:  Can I have a moment, Judge?

7        THE COURT:  Yes.

8            I will give you May 29, 30 --

9        MR. SMITH:  I can come in on the 30th and file

10   those motions.  I will be here.

11       MR. BROGAN: That's fine.  By agreement.

12       MR. SMITH:  By agreement.

13       THE COURT:  Okay.

14       MR. SMITH:  Thank you, Judge.  By agreement.

15       THE COURT:  You're welcome.

16               (Whereupon, the above matter was

17                continued to May 30, 2002.)

18

19

20

21

22

23

24

IN THE CIRCUIT COURT OF COOK JUDICIAL CIRCUIT

COOK COUNTY, ILLINOIS




I, NOREEN SULLIVAN ERICKSON, an Official
Court Reporter for the Circuit Court of Cook County,
Cook Judicial Circuit of Illinois, do hereby certify
that I reported in shorthand the proceedings had on
the hearing in the above-entitled cause; that I
thereafter caused the foregoing to be transcribed into
typewriting, which I hereby certify to be a true and
accurate transcript of the proceedings had before the
honorable THOMAS SUMNER, Judge of said court.

OFFICIAL COURT REPORTER

License No. 84-1527

| * NAME (LAST, FIRST, M.I.D.D.L.E) | 2 SEX | 3 RACE | 4 AGE | 5 DATE OF BIRTH DAY / MONTH / YEAR |
|---|---|---|---|---|
| PERNELL; Mikel | M | 1 | 20 | 02  Sep  79 |

NO 4520840

33440-EF

| 15 ALIAS OR NICKNAME | 8 DIST/BEAT | 9 HEIGHT | 10 WEIGHT | 11 HAIR | 12 EYES | 13 COMPLEXION |
|---|---|---|---|---|---|---|
| | 007 | 5'8 | 166 | Blk | Natl | Brn | Med. Brn. |

| 16 RESIDENCE ADDRESS | APT NO/FLOOR | 17 DISTING MARKS, SCARS, DISABILITIES, ETC | 18 SOCIAL SECURITY NO |
|---|---|---|---|
| 6424 S. Seeley | | N one Visible | |

| 16A CITY, STATE | ZIP CODE | HOME TELEPHONE | 20 STATE/PLACE OF BIRTH | 21 DRIVERS LICENSE NO | STATE |
|---|---|---|---|---|---|
| Chgo  Ill. | | NONE | Illinois | P654 5407 9250 | Ill |

NO. F - 387787
387 535

| 23 OCCUPATION | 24 BUSINESS NAME / ADDRESS | CITY, STATE  ZIP CODE  BUSINESS TELEPHONE |
|---|---|---|
| NONE | | |

DRESS OF ARREST
1324 W. 64th Street

| 26 LOC ARRESTED | 27 LOCATION CODE (OF NATURE OF PREMISES) | 28 BEAT OF ARREST | 29 DATE OF ARREST DAY MONTH YEAR | TIME | 30 ARRESTEE TRANSPORTED TO (UNIT) BY/BEAT | TIME |
|---|---|---|---|---|---|---|
| 1 | 304 | 724 | 27 Jun 00 | 2130 | 610 5134 | 2140 |

| 33 PROPERTY INVENTORY NOS. 2348320 | 34 FOR NARCOTIC ARREST | ARRESTEE WT NO PILLS | EST. STREET VALUE CALC ORIG CHGSE |
|---|---|---|---|
| 2348320; 322 | ☐ SUSPECT CANNABIS / ☒ SUSPECT CONTROLLED SUBSTANCE  DNA | PAX 0.66;  S | |

| 31 LISTED CARS | 32 WEAPON | | 35 VEHICLE | 36 YEAR | MAKE | BODY-STYLE | COLOR | STATE LICENSE NO OR VIN | DISPOSITION OF VEHICLE |
|---|---|---|---|---|---|---|---|---|---|
| NO ☒  YES ☐ | ☐ REVOLVER ☐ RIFLE ☐ SHOT GUN ☐ KNIFE ☐  ☒ OTHER (SPECIFY) | | | 1981 | Malibu | 2door | Blue | J625766 | Towed |

| PERSON / INVESTIGATIVE UNIT NOTIFIED | UNIT NOTIFIED | TIME | 37 DOES ARRESTEE HAVE DEPENDENT CHILDREN AT HOME ☐ YES ☐ NO | IF YES: NAME OF YD MEMBER NOTIFIED - TIME | 38 NAME OF A S.A.FE. REV | CHARGES APPROVED 01 JUL 00 |
|---|---|---|---|---|---|---|
| /Det. Div. Arrest | | | | | P. Karlovics | ☒ YES ☐ NO  @ 1600 |

| 39 NAME | | SEX | RACE | AGE | HOME ADDRESS | CITY-STATE | ZIP CODE | TELEPHONE NO |
|---|---|---|---|---|---|---|---|---|
| PHILLIPS, Melvin | | M | 1 | 18 | 6139 S. wood Street | | | .773  436 1669 |

| 39 INJURED Mult'l GSW's | VICTIM HOSPITALIZED ☒ YES ☐ NO ☐ TREATED & RELEASED | HOSP. NAME |
|---|---|---|
| GSW's ☐ NO  FATAL- DAVIS & JONES | | M. Phillips = St. Bernard + CCH  G. Phillips = Christ & St. Bernards |
| PHILLIPS, Greg + Melvin | | |

| 40 REFERENCES (CH - PAR) | 41 OFFENSES | 42 DISPOSITIONS | 40 REFERENCES (CH - PAR) | 41 OFFENSES | 42 DISPOSITIONS |
|---|---|---|---|---|---|
| 20 Ilcs 5/9-1 | 1st Deg. Murder | | 5 | | |
| 20 Ilcs 5/9-1 | 1st Deg. Murder | | 6 | | |
| 20 Ilcs 12/4.2 | Agg. Bat. Firearm | | 7 | | |
| 20 Ilcs 12/4.2 | Agg. Bat. Firearm | | 8 | | |

NARRATIVE (The facts for probable cause to arrest AND to substantiate the charges include, but are not limited to, the following:)

The arrestee was placed under arrest after returning to the scene of this incident
after having been named as one of several offenders who shot the victim in this case.

\* Ref.  RD#:  F-387787  - The above also under arrest for the murders of Valerie DAVIS &]
James JONES which occured on 27 JUN 2000 @ 1433 W. 63rd Street.  PERNELL gave a post-
Miranda statement as to his involvement in those murders which was later memorialized in
a video recorded format.

**DEFENDANT'S EXHIBIT C**

Arresting Dets.: Holmes #20223    Konow #21113   Szudarski #20259

I do solemnly, sincerely, and truly declare and affirm that the facts stated herein are accurate to the best of my knowledge.

| ARRESTING APPROVING OFFICER SIGNATURE | STAR NO | UNIT | DET'S SIGNATURE | STAR EMP. NO |
|---|---|---|---|---|
| | 6/0 | | | 2055 |

| 45 FIRST ARRESTING OFFICER PRINT NAME, STAR NO | UNIT | BEAT NO | FLP/O | D.O CRF | WSD ORD CRF KEY | 45 SECOND ARRESTING OFFICER PRINT NAME, STAR NO | UNIT | 46 VEHICLES USED ☐ ONE ☐ TWO ☐ NONE |
|---|---|---|---|---|---|---|---|---|
| Det. T. Kelly #20229 | | 5134 | 7B | 5 | | Det. J. Burke #20088 | 610 | |

| 47 INITIAL APPROVAL OF PROBABLE CAUSE - SIG - STAR | 48 RESULTS OF FINGERPRINT CHECK WAIVED BY: SIG - STAR | DATE | TIME | 49 APPROVAL OF CHARGES - SIG - STAR | DATE |
|---|---|---|---|---|---|
| | | | | | |

WATCH COMMANDER'S NOTATIONS

| 50 ARRESTEE SEARCHED BY | STAR EMP. NO | UNIT | 51 DATE RECEIVED - LOCKUP | TIME | 52 PERS. PROPERTY RECEIPT NO | 53 TELEPHONE NO CALLED | TIME |
|---|---|---|---|---|---|---|---|
| ALTMAN | 18296 | 007 | 1 Jul 00 | 1740 | BOX | (773) 737-5170 | 1740 |

| BOOKING OFFICER | STAR EMP. NO | UNIT | 55 TIME FINGERPRINTED | 56 TIME PHOTOGRAPHED | 57 TIME FED | 58 PLACED IN CELL NO |
|---|---|---|---|---|---|---|
| WILCOX | 8781 | 007 | 1745 | 1750 | | 15 |

COURT INFORMATION

| 59 1ST DET'S 1ST COURT DATE | BRANCH CALL | 60 COURT SET TO HANDLE | 61 INITIAL CO CRT DATE | BRANCH CALL | 62 FINAL CRT DATE | BRANCH CALL |
|---|---|---|---|---|---|---|
| 03 JUL 00 | 66 | ☐ YES ☒ NO | 2 Jul 00 BRT | | | |
| 64 BOND POSTED DATE | | 65 COURT DOCKET NO | | | 66 FINAL JUDGE'S NAME | |
| To COURT | | | | | | |

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

PEOPLE OF THE STATE OF ILLINOIS

VS                          NUMBER 00113319001

MIKEL        PERNELL

CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois, and keeper of the records and seal thereof do hereby certify that the electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County/Local Prosecutor has filed a complaint with the Clerk of the Circuit Court.

Charging the above named defendant with:

| | | | |
|---|---|---|---|
| 720-5.0/9-1 | | F | FIRST DEGREE MURDER |
| 720-5.0/9-1 | | F | FIRST DEGREE MURDER |

The following disposition(s) was/were rendered before the Honorable Judge(s):

07/02/00 PROBABLE CAUSE TO DETAIN
    KIRBY, JOHN P.
07/02/00 DEF DEMAND FOR TRIAL
    KIRBY, JOHN P.
07/02/00 BAIL AMOUNT SET                                                $ 750000
    KIRBY, JOHN P.
07/02/00 MOTION STATE - CONTINUANCE -MS          07/03/00 1166
    KIRBY, JOHN P.
07/03/00 MOTION STATE - CONTINUANCE -MS          07/24/00 1166
    KIRBY, JOHN P.
07/03/00 DEF DEMAND FOR TRIAL
    KIRBY, JOHN P.
07/24/00 SUPERSEDED BY DIRECT INDTMENT      C001
    00CR18362
    LINEHAN, NEIL J.
07/24/00 SUPERSEDED BY DIRECT INDTMENT      C002
    LINEHAN, NEIL J.
07/24/00 TRANSFERRED TO CRIMINAL DIV          08/14/00 1701
    LINEHAN, NEIL J.
07/24/00 DEF DEMAND FOR TRIAL
    LINEHAN, NEIL J.

I hereby certify that the foregoing has been entered of record on the above captioned case.
Date 03/08/05

DOROTHY BROWN
CLERK OF THE CIRCUIT COURT OF COOK COUNTY

DEFENDANT'S
EXHIBIT
D

**FELONY**                                    CCCR-N662-100M-2-1-00(03420176)

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

The People of Illinois
**Plaintiff**                         **COMPLAINT FOR PRELIMINARY EXAMINATION**

v.                                    NO._____

Mikel PERNELL                         001133190
**Defendant**

Gregory PHILLIPS                                            complaint, now appears before
(Complainant's Name Printed of Typed)

The Circuit Court of Cook County and states that

Mikel PERNELL                    6424 S. Seeley  Chgo. Il              has, on or about
(defendant)                              (address)

27 Jun 00                    at   1300 W. 64th Street  Chgo. Il. Cook County
(date)                                   (place of offense)

committed the offense of  Aggravated Battery with a Firearm              in that he/she

knowingly and intentionally shot and wounded Gregory PHILLIPS

in violation of        720     **ILCS**              5    /  12-4.2
                   (Chapter)                    (Act)         (Section)

[ ] [ ] [ ] FILED          Det. W Sul #2053 For Gregory Phill
                            (Complainant's Signature)

CHARGE CODE

**STATE OF ILLINOIS** }
**COOK COUNTY**       } ss.

       AURELIA PUCINSKI
       CLERK OF CIRCUIT COURT He      (Complainant's Address)          (Telephone No.)

                                      Greegory PHILLIPS
                                      (Complainant's Name Printed or Typed)

being first duly sworn,                      on oath, deposes and says the he/she read the foregoing
complaint by him/her subscribed and that the same is true.

                                      Det. W Sul #2053 For Gregory Phil
                                      (Complainant's Signature)

Subscribed and sworn to before me _____      01 Jul , 2000

                    Aurelia Pucinski  Sgt W. Kelly 16
                                      (Judge or Clerk)

I have examined the above complaint and the person presenting the same and have heard evidence thereon, and am satisfied that there
is probable cause for filling same. Leave is given to file said complaint.

Summons Issued,         Judge_____
   or
Warrant Issued,         Bail set at,_____     Judge's No.
   or
Bail set at _____ Judge _____

AURELIA PUCINSKI, CLERK OF THE CIRCUIT COURT OF COOK COUNTY

DEFENDANT'S
EXHIBIT
E

COURT FILE COPY

66-2
**(Court Branch)**

03 Jul 00
**(Court Date)**

**FELONY**

CCCR-N662-100M-2-1-00(03420176)

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

The People of Illinois
**Plaintiff**

**COMPLAINT FOR PRELIMINARY EXAMINATION**

v.

NO.

0011331<del>90</del>

Mikel PERNELL
**Defendant**

Melvin PHILLIPS _____ complaint, now appears before
**(Complainant's Name Printed of Typed)**

The Circuit Court of Cook County and states that

Mikel PERNELL _____ 6424 S. Seeley  Chgo. Il. _____ has, on or about
**(defendant)** **(address)**

27 Jun 00 _____ at 1300 W. 64th Street  Chicago Il.  Cook County
**(date)** **(place of offense)**

committed the offense of ___AGGRAVATED BATTERY with a FIREARM_____ in that he/she
knowingly and intentionally shot and wounded  the complainant, Melvin PHILLIPS

in violation of _____720___**ILCS**_____5__/__12-4.2____
**(Chapter)** **(Act)** **(Section)**

CHARGE CODE

*Ad. W. Sil #20153 For Melvin Phillips*
**(Complainant's Signature)**

STATE OF ILLINOIS
COOK COUNTY } ss.

FILED

JUL  2 2000

AURELIA PUCINSKI
CLERK OF CIRCUIT COURT

He

**(Complainant's Address)** **(Telephone No.)**

Melvin PHILLIPS
**(Complainant's Name Printed or Typed)**

being first duly sworn, _____
complaint by him/her subscribed and that the same is true

on oath, deposes and says the he/she read the foregoing

*Ad. W. Sil #20153 For Melvin Phil*
**(Complainant's Signature)**

Subscribed and sworn to before me _____ 01 Jul , 2000

*Aurelia Pucinski  Sgt W Kelly 16*
**(Judge or Clerk)**

I have examined the above complaint and the person presenting the same and have heard evidence thereon, and am satisfied that there is probable cause for filling same. Leave is given to file said complaint.

Summons Issued,
or      Judge _____
Warrant Issued,    Judge's No. _____
or      Bail set at, _____
Bail set at _____ Judge _____
Judge's No. _____

**AURELIA PUCINSKI, CLERK OF THE CIRCUIT COURT OF COOK COUNTY**

**COURT FILE COPY**

PEOPLE OF THE STATE OF ILLINOIS

VS                         NUMBER 00CR1836201

MIKEL        PERNELL

## CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois, and keeper of the records and seal thereof do hereby certify that the electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION with the Clerk of the Circuit Court.

Charging the above named defendant with:

| | | |
|---|---|---|
| 720-5/9-1(A)(1) | F | MURDER/INTENT TO KILL/INJ |
| 720-5/9-1(A)(1) | F | MURDER/INTENT TO KILL/INJ |
| 720-5/9-1(A)(2) | F | MURDER/STRONG PROB KILL/I |
| 720-5/9-1(A)(2) | F | MURDER/STRONG PROB KILL/I |
| 720-5/9-1(A)(3) | F | MURDER/OTHER FORCIBLE FEL |
| 720-5/9-1(A)(3) | F | MURDER/OTHER FORCIBLE FEL |
| 720-5/9-1(A)(1) | F | MURDER/INTENT TO KILL/INJ |
| 720-5/9-1(A)(1) | F | MURDER/INTENT TO KILL/INJ |
| 720-5/9-1(A)(2) | F | MURDER/STRONG PROB KILL/I |
| 720-5/9-1(A)(2) | F | MURDER/STRONG PROB KILL/I |
| 720-5/9-1(A)(3) | F | MURDER/OTHER FORCIBLE FEL |
| 720-5/9-1(A)(3) | F | MURDER/OTHER FORCIBLE FEL |
| 720-5/9-1(A)(1) | F | MURDER/INTENT TO KILL/INJ |
| 720-5/9-1(A)(1) | F | MURDER/INTENT TO KILL/INJ |
| 720-5/9-1(A)(2) | F | MURDER/STRONG PROB KILL/I |
| 720-5/9-1(A)(2) | F | MURDER/STRONG PROB KILL/I |
| 720-5/9-1(A)(3) | F | MURDER/OTHER FORCIBLE FEL |
| 720-5/9-1(A)(3) | F | MURDER/OTHER FORCIBLE FEL |
| 720-5/9-1(A)(1) | F (ATT) | MURDER/INTENT TO KILL/INJ |
| 720-5/9-1(A)(1) | F (ATT) | MURDER/INTENT TO KILL/INJ |
| 720-5/9-1(A)(1) | F (ATT) | MURDER/INTENT TO KILL/INJ |
| 720-5/9-1(A)(1) | F (ATT) | MURDER/INTENT TO KILL/INJ |
| 720-5/12-4.2(A)(1) | F | AGG BATTERY W/FIREARM/PER |
| 720-5/12-4.2(A)(1) | F | AGG BATTERY W/FIREARM/PER |
| 720-5/24-1.2(A)(2) | F | AGG DISCHARGE FIREARM/OCC |

The following disposition(s) was/were rendered before the Honorable Judge(s):

07/31/00 IND/INFO-CLK OFFICE-PRES JUDGE          08/14/00 1701
    00CR1836201 ID# CR100520691
08/14/00 CASE ASSIGNED                           08/14/00 1721
    FITZGERALD, THOMAS R.
08/14/00 DEFENDANT IN CUSTODY                     00/00/00
    FITZGERALD, THOMAS R.



DEFENDANT'S EXHIBIT
F

PEOPLE OF THE STATE OF ILLINOIS

                    VS                    NUMBER 00CR1836201

MIKEL      PERNELL

### CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
with the Clerk of the Circuit Court.

| | | | | |
|---|---|---|---|---|
| 08/14/00 DEFENDANT IN CUSTODY<br>SUMNER, THOMAS R | 00/00/00 | | | |
| 08/14/00 PRISONER DATA SHEET TO ISSUE<br>SUMNER, THOMAS R | 00/00/00 | | | |
| 08/14/00 CONTINUANCE BY AGREEMENT<br>SUMNER, THOMAS R | 08/16/00 | | | |
| 08/16/00 DEFENDANT IN CUSTODY<br>SUMNER, THOMAS R | 00/00/00 | | | |
| 08/16/00 PRISONER DATA SHEET TO ISSUE<br>SUMNER, THOMAS R | 00/00/00 | | | |
| 08/16/00 DEFENDANT ARRAIGNED<br>SUMNER, THOMAS R | 00/00/00 | | | |
| 08/16/00 PLEA OF NOT GUILTY<br>SUMNER, THOMAS R | 00/00/00 | | | |
| 08/16/00 ADMONISH AS TO TRIAL IN ABSENT<br>SUMNER, THOMAS R | 00/00/00 | | | |
| 08/16/00 MOTION FOR DISCOVERY<br>SUMNER, THOMAS R | 00/00/00 F | | 1 | |
| 08/16/00 CONTINUANCE BY AGREEMENT<br>SUMNER, THOMAS R | 09/26/00 | | | |
| 09/26/00 DEFENDANT IN CUSTODY<br>SUMNER, THOMAS R | 00/00/00 | | | |
| 09/26/00 PRISONER DATA SHEET TO ISSUE<br>SUMNER, THOMAS R | 00/00/00 | | | |
| 09/26/00 CONTINUANCE BY AGREEMENT<br>SUMNER, THOMAS R | 10/26/00 | | | |
| 10/26/00 DEFENDANT IN CUSTODY<br>SUMNER, THOMAS R | 00/00/00 | | | |
| 10/26/00 PRISONER DATA SHEET TO ISSUE<br>SUMNER, THOMAS R | 00/00/00 | | | |
| 10/26/00 MOTION FOR BAIL REDUCTION<br>SUMNER, THOMAS R | | S | 2 | |
| 10/26/00 BAIL AMOUNT SET<br>SUMNER, THOMAS R | 00/00/00 | | | $1000000 |
| 10/26/00 CONTINUANCE BY AGREEMENT<br>SUMNER, THOMAS R | 12/06/00 | | | |
| 12/06/00 DEFENDANT IN CUSTODY<br>LACY, WILLIAM G. | 00/00/00 | | | |

PEOPLE OF THE STATE OF ILLINOIS

                    VS                    NUMBER 00CR1836201

MIKEL     PERNELL

CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
with the Clerk of the Circuit Court.

| | | |
|---|---|---|
| 12/06/00 PRISONER DATA SHEET TO ISSUE | 00/00/00 | |
| LACY, WILLIAM G. | | |
| 12/06/00 CONTINUANCE BY AGREEMENT | 01/10/01 | |
| LACY, WILLIAM G. | | |
| 01/10/01 DEFENDANT IN CUSTODY | 00/00/00 | |
| SUMNER, THOMAS R | | |
| 01/10/01 PRISONER DATA SHEET TO ISSUE | 00/00/00 | |
| SUMNER, THOMAS R | | |
| 01/10/01 APPEARANCE FILED | 00/00/00 | |
| SUMNER, THOMAS R | | |
| 01/10/01 CONTINUANCE BY AGREEMENT | 02/20/01 | |
| SUMNER, THOMAS R | | |
| 02/20/01 PRISONER DATA SHEET TO ISSUE | | |
| SUMNER, THOMAS R | | |
| 02/20/01 CONTINUANCE BY AGREEMENT | 03/15/01 | |
| SUMNER, THOMAS R | | |
| 03/15/01 PRISONER DATA SHEET TO ISSUE | 00/00/00 | |
| SUMNER, THOMAS R | | |
| 03/15/01 CONTINUANCE BY AGREEMENT | 04/26/01 | |
| SUMNER, THOMAS R | | |
| 04/26/01 PRISONER DATA SHEET TO ISSUE | 00/00/00 | |
| SUMNER, THOMAS R | | |
| 04/26/01 CONTINUANCE BY AGREEMENT | 05/16/01 | |
| SUMNER, THOMAS R | | |
| 05/16/01 DEFENDANT IN CUSTODY | | |
| LACY, WILLIAM G. | | |
| 05/16/01 PRISONER DATA SHEET TO ISSUE | | |
| LACY, WILLIAM G. | | |
| 05/16/01 CONTINUANCE BY AGREEMENT | 05/30/01 | |
| LACY, WILLIAM G. | | |
| 05/30/01 DEFENDANT IN CUSTODY | 00/00/00 | |
| SUMNER, THOMAS R | | |
| 05/30/01 PRISONER DATA SHEET TO ISSUE | 00/00/00 | |
| SUMNER, THOMAS R | | |
| 05/30/01 MOTION FOR BAIL REDUCTION | 00/00/00 D | 2 |
| SUMNER, THOMAS R | | |
| 05/30/01 CONTINUANCE BY AGREEMENT | 06/28/01 | |
| SUMNER, THOMAS R | | |

PEOPLE OF THE STATE OF ILLINOIS

VS                    NUMBER 00CR1836201

MIKEL      PERNELL

## CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois, and keeper of the records and seal thereof do hereby certify that the electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION with the Clerk of the Circuit Court.

| | | |
|---|---|---|
| 06/28/01 PRISONER DATA SHEET TO ISSUE<br>SUMNER, THOMAS R | 00/00/00 | |
| 06/28/01 CONTINUANCE BY AGREEMENT<br>SUMNER, THOMAS R | 07/17/01 | |
| 06/28/01 DEFENDANT IN CUSTODY<br>SUMNER, THOMAS R | 00/00/00 | |
| 06/28/01 PRISONER DATA SHEET TO ISSUE<br>SUMNER, THOMAS R | 00/00/00 | |
| 06/28/01 CONTINUANCE BY AGREEMENT<br>SUMNER, THOMAS R | 07/17/01 | |
| 07/17/01 DEFENDANT IN CUSTODY<br>SUMNER, THOMAS R | 00/00/00 | |
| 07/17/01 PRISONER DATA SHEET TO ISSUE<br>SUMNER, THOMAS R | 00/00/00 | |
| 07/17/01 WITNESSES ORDERED TO APPEAR<br>SUMNER, THOMAS R | 00/00/00 | |
| 07/17/01 CONTINUANCE BY AGREEMENT<br>SUMNER, THOMAS R | 09/13/01 | |
| 09/13/01 DEFENDANT IN CUSTODY<br>SUMNER, THOMAS R | 00/00/00 | |
| 09/13/01 PRISONER DATA SHEET TO ISSUE<br>SUMNER, THOMAS R | 00/00/00 | |
| 09/13/01 WITNESSES ORDERED TO APPEAR<br>SUMNER, THOMAS R | 00/00/00 | |
| 09/13/01 CONTINUANCE BY AGREEMENT<br>SUMNER, THOMAS R | 10/24/01 | |
| 10/24/01 DEFENDANT IN CUSTODY<br>SUMNER, THOMAS R | 00/00/00 | |
| 10/24/01 PRISONER DATA SHEET TO ISSUE<br>SUMNER, THOMAS R | 00/00/00 | |
| 10/24/01 CONTINUANCE BY AGREEMENT<br>SUMNER, THOMAS R | 12/03/01 | |
| 12/03/01 DEFENDANT IN CUSTODY<br>SUMNER, THOMAS R | 00/00/00 | |
| 12/03/01 PRISONER DATA SHEET TO ISSUE<br>SUMNER, THOMAS R | 00/00/00 | |
| 12/03/01 CONTINUANCE BY AGREEMENT<br>SUMNER, THOMAS R | 12/11/01 | |

PEOPLE OF THE STATE OF ILLINOIS

VS                          NUMBER 00CR1836201

MIKEL        PERNELL

CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois, and keeper of the records and seal thereof do hereby certify that the electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION with the Clerk of the Circuit Court.

| | |
|---|---|
| 12/11/01 DEFENDANT IN CUSTODY<br>SUMNER, THOMAS R | 00/00/00 |
| 12/11/01 PRISONER DATA SHEET TO ISSUE<br>SUMNER, THOMAS R | 00/00/00 |
| 12/11/01 WITNESSES ORDERED TO APPEAR<br>SUMNER, THOMAS R | 00/00/00 |
| 12/11/01 CONTINUANCE BY AGREEMENT<br>SUMNER, THOMAS R | 01/23/02 |
| 01/23/02 DEFENDANT IN CUSTODY<br>SUMNER, THOMAS R | 00/00/00 |
| 01/23/02 PRISONER DATA SHEET TO ISSUE<br>SUMNER, THOMAS R | 00/00/00 |
| 01/23/02 WITNESSES ORDERED TO APPEAR<br>SUMNER, THOMAS R | 00/00/00 |
| 01/23/02 CONTINUANCE BY AGREEMENT<br>SUMNER, THOMAS R | 02/21/02 |
| 02/21/02 DEFENDANT IN CUSTODY<br>SUMNER, THOMAS R | 00/00/00 |
| 02/21/02 PRISONER DATA SHEET TO ISSUE<br>SUMNER, THOMAS R | 00/00/00 |
| 02/21/02 TRIAL COMENCED AND CONTINUED<br>SUMNER, THOMAS R | 03/18/02 |
| 03/18/02 DEFENDANT IN CUSTODY<br>SUMNER, THOMAS R | 00/00/00 |
| 03/18/02 PRISONER DATA SHEET TO ISSUE<br>SUMNER, THOMAS R | 00/00/00 |
| 03/18/02 CONTINUANCE BY AGREEMENT<br>SUMNER, THOMAS R | 04/17/02 |
| 04/17/02 DEFENDANT IN CUSTODY<br>SUMNER, THOMAS R | 00/00/00 |
| 04/17/02 PRISONER DATA SHEET TO ISSUE<br>SUMNER, THOMAS R | 00/00/00 |
| 04/17/02 CONTINUANCE BY AGREEMENT<br>SUMNER, THOMAS R | 05/01/02 |
| 05/01/02 PRISONER DATA SHEET TO ISSUE<br>SUMNER, THOMAS R | 00/00/00 |
| 05/01/02 CONTINUANCE BY AGREEMENT<br>SUMNER, THOMAS R | 05/16/02 |

PEOPLE OF THE STATE OF ILLINOIS

VS                    NUMBER 00CR1836201

MIKEL          PERNELL

CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION
with the Clerk of the Circuit Court.

| | | | |
|---|---|---|---|
| 05/16/02 PRISONER DATA SHEET TO ISSUE SUMNER, THOMAS R | 00/00/00 | | |
| 05/16/02 MOTION TO SUPPRESS SUMNER, THOMAS R | 00/00/00 | D | 2 |
| 05/16/02 WITNESSES ORDERED TO APPEAR SUMNER, THOMAS R | 00/00/00 | | |
| 05/16/02 CONTINUANCE BY AGREEMENT SUMNER, THOMAS R | 05/30/02 | | |
| 05/30/02 DEFENDANT IN CUSTODY LAWS, MARJORIE C. | 00/00/00 | | |
| 05/30/02 PRISONER DATA SHEET TO ISSUE LAWS, MARJORIE C. | 00/00/00 | | |
| 05/30/02 CONTINUANCE BY AGREEMENT LAWS, MARJORIE C. | 06/06/02 | | |
| 06/06/02 DEFENDANT IN CUSTODY SUMNER, THOMAS R | 00/00/00 | | |
| 06/06/02 PRISONER DATA SHEET TO ISSUE SUMNER, THOMAS R | 00/00/00 | | |
| 06/06/02 BEHAVIOR CLINIC EXAM ORDERED SUMNER, THOMAS R | 07/17/02 | | |
| 06/06/02 CONTINUANCE BY AGREEMENT SUMNER, THOMAS R | 07/17/02 | | |
| 07/17/02 PRISONER DATA SHEET TO ISSUE SUMNER, THOMAS R | 00/00/00 | | |
| 07/17/02 PSYCHIATRIC EXAM REPORT FILED SUMNER, THOMAS R | 00/00/00 | | |
| 07/17/02 DEFENDANT FOUND FIT SUMNER, THOMAS R | 00/00/00 | | |
| 07/17/02 CONTINUANCE BY AGREEMENT SUMNER, THOMAS R | 08/15/02 | | |
| 08/15/02 PRISONER DATA SHEET TO ISSUE SUMNER, THOMAS R | 00/00/00 | | |
| 08/15/02 CONTINUANCE BY AGREEMENT SUMNER, THOMAS R | 09/19/02 | | |
| 09/19/02 PRISONER DATA SHEET TO ISSUE SUMNER, THOMAS R | 00/00/00 | | |
| 09/19/02 CONTINUANCE BY AGREEMENT SUMNER, THOMAS R | 10/30/02 | | |

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

PEOPLE OF THE STATE OF ILLINOIS

VS          NUMBER 00CR1836201

MIKEL    PERNELL

CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois, and keeper of the records and seal thereof do hereby certify that the electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County filed an INDICTMENT/INFORMATION with the Clerk of the Circuit Court.

| Date | Event | Date2 |
|---|---|---|
| 02/26/03 | CONTINUANCE BY AGREEMENT SUMNER, THOMAS R | 03/18/03 |
| 03/18/03 | DEFENDANT IN CUSTODY SUMNER, THOMAS R | 00/00/00 |
| 03/18/03 | PRISONER DATA SHEET TO ISSUE SUMNER, THOMAS R | 00/00/00 |
| 03/18/03 | CONTINUANCE BY AGREEMENT SUMNER, THOMAS R | 03/20/03 |
| 03/20/03 | DEFENDANT IN CUSTODY SUMNER, THOMAS R | 00/00/00 |
| 03/20/03 | PRISONER DATA SHEET TO ISSUE SUMNER, THOMAS R | 00/00/00 |
| 03/20/03 | SPECIAL ORDER MOTION TO RECONSIDER DENIED SUMNER, THOMAS R | 00/00/00 |
| 03/20/03 | WITNESSES ORDERED TO APPEAR SUMNER, THOMAS R | 00/00/00 |
| 03/20/03 | MOTION DEFT - CONTINUANCE - MD SUMNER, THOMAS R | 04/10/03 |
| 04/10/03 | NOLLE PROSEQUI SUMNER, THOMAS R | CALL 00/00/00 |

I hereby certify that the foregoing has been entered of record on the above captioned case.
Date 08/14/03

DOROTHY BROWN
CLERK OF THE CIRCUIT COURT OF COOK COUNTY

# IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CRIMINAL DIVISION

PEOPLE OF THE STATE OF ILLINOIS

vs.

Case No. 00 CR 18362

MIKEL PERNELL

FILED
TIME_____ AM PM
JAN 28 2003
Dorothy Brown
Clerk of the Circuit Court
Criminal Division
Deputy Clerk Signature

## AMENDED MOTION TO SUPPRESS STATEMENTS

NOW COMES the Defendant, Mikel Pernell, through his attorney, Gregg L. Smith, pursuant to 725 ILCS 5/114-11, moves this Honorable Court to suppress as evidence any and all oral and written communications, confessions, statements, admissions, or tests, whether inculpatory or exculpatory, alleged to have been made by the Defendant for the following reasons:

1. Defendant was arrested on June 27, 2000 at 9:30 p.m., at or in the vicinity of 1324 W. 64th Street, Chicago, Cook County, Illinois.

2. Subsequent to his arrest, the Defendant was interrogated by: Chicago Police Detective J. Riley *20250, Detective T. Kelly *20229, Detective G. Holmes *20223, Detective S. Konow *21113, Detective A. Szudarski *20259, Detective J. Burke *20188, Detective E. Farley *20643, Detective R. Lenihan *20593 and Cook County Assistant State's Attorney Tom Byrne.

3. The verbal statements given to law enforcement personnel on June 27, 2000, June 28, 2000, June 29, 2000, June 30, 2000 and the video taped statement of June 30, 2000 were the result of physical coercion directed against the Defendant in that after his arrest he was taken to Area One and placed in a small interview room where he was denied the use of a restroom, provided with a minimal amount of food, refused the right to make a phone call to his lawyer and family, was denied asthma medication and was repeatedly struck in the back of his head, shoved and threatened by the abovementioned Chicago Police Detectives. Additionally, he was detained from June 27, 2000 at 9:30 p.m. until June 30, 2000 4:00 p.m. when he allegedly provided Chicago Police and the Cook County State's Attorneys Office with a video taped confession. A total of sixty-six and one half hours of custodial interrogation.

4. The above noted statements sought to be suppressed were obtained as a result of psychological and mental coercion, and direct and indirect promises and threats directed against the Defendant by the above-named



Chicago Police Detectives at the Area One Chicago Police Department and such statements were, therefore, involuntary.

5. A statement(s) is made voluntarily where:

   under the totality of the circumstances, it is given freely, voluntarily and without compulsion. A statement(s) is involuntary if the defendant's will was overcome at the time he confessed. Factors to be considered when making a determination of voluntariness include the age, education and intelligence of the accused, the length of the detention and the duration of questioning, whether the accused was advised of his constitutional rights and whether the accused was subject to any physical mistreatment. People v. House, 141 Ill.2d 323, 376, 566 N.E.2d 259, 283 (1990).

6. Because the Defendant at the time of his arrest was only twenty years old, had only two prior misdemeanor arrests in his lifetime, had had no prior experience with custodial interrogation, was detained for over sixty-six hours, received only one year of post G.E.D. education, was denied all but minimal amounts of food and water, was denied use of the bathroom for hours at a time, was prevented from contacting his family and/or lawyer by telephone, was denied asthma medication, was threatened, shoved and struck in the back of his head by interrogating Chicago Police Detectives among other scare tactics, any and all communications, confessions, statements, admissions, or tests by the Defendant were involuntarily given in violation of his constitutional rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments to the Constitution of the United States and his rights under the Constitution of the State of Illinois, and must be suppressed.

7. That during the course of custodial interrogation, the Defendant was not read his Miranda warnings (June 27th, 28th, 29th and 30th, 2000).

8. That Detectives Farley and Lenihan continued to interrogate the Defendant after he invoked his right to counsel during his June 28th, 29th and 30th meetings and that both Detectives used physical violence against him on June 29th and June 30th at area 1 police station.

WHEREFORE, the Defendant requests that his Honorable Court, pursuant to 725 ILCS 5/114-11:

    a. conduct a pretrial hearing to determine whether the statements alleged to have been given were voluntary in nature; and

    b. suppress as evidence any and all communications, confessions, statements, admissions, or tests, whether inculpatory or exculpatory, written or oral, made by the Defendant.

Respectfully submitted,

Gregg L. Smith, Attorney for
Mikel Pernell

Law Offices of Gregg L. Smith
205 W. Randolph Street, Ste. #1040
Chicago, IL 60606
Phone No. 312-629-1778
Attorney No. 29678

RECEIVED

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JUL 3 1 2003

MICHAEL W DOBBINS
CLERK, U.S. DISTRICT COURT

MIKEL PERNELL, )
)
)
Plaintiff, )
)
v. )
)
Chicago Police Officers **EDWARD FARLEY, Star No.** )
**20643; THOMAS KELLY, Star No. 20229, ROBERT** )
**LENIHAN, Star No. 20593, JAMES RILEY, Star No.** )
**20250**, the **CITY OF CHICAGO**, a Municipal )
Corporation, and unknown and unnamed officers, )
)
)
Defendants. )

Case No.

# 03C 5316

COMPLAINT FOR
VIOLATION OF
CIVIL RIGHTS AND
SUPPLEMENTAL STATE
CLAIMS

JUDGE KENNELLY
DEMAND FOR
JURY TRIAL
MAGISTRATE JUDGE ASHMAN

## JURISDICTION AND VENUE

1.      This action arises under the United States Constitution and the Civil Rights Act of

1871 [42 U.S.C. Section 1983]. This court has jurisdiction under and by virtue of 28 U.S.C.

Sections 1343 and 1331.

2.      Venue is founded in this judicial court upon 28 U.S.C. Section 1391 as the acts

complained of arose in this district.

## PARTIES

3.      At all times herein mentioned, plaintiff Mikel Pernell ("Pernell"), was and now is a

citizen of the United States, and resides within the jurisdiction of this court.



4.     At all times herein mentioned defendant, Detective James Riley, Star No. 20250 ("Riley") was a member of the City of Chicago Police Department, and was acting under color of state law and as the employee, agent or representative of the City of Chicago. Riley is being sued in his individual/personal capacity.

5.     At all times herein mentioned defendant, Detective Thomas Kelly, Star No. 20229 ("Kelly") was a member of the City of Chicago Police Department, and was acting under color of state law and as the employee, agent or representative of the City of Chicago. Kelly is being sued in his individual/personal capacity.

6.     At all times herein mentioned defendant, Detective Edward Farley, Star No. 20643 ("Farley") was a member of the City of Chicago Police Department, and was acting under color of state law and as the employee, agent or representative of the City of Chicago. Farley is being sued in his individual/personal capacity.

7.     At all times herein mentioned defendant, Detective Robert Lenihan Star No. 20593 ("Lenihan") was a member of the City of Chicago Police Department, and was acting under color of state law and as the employee, agent or representative of the City of Chicago. Lenihan is being sued in his individual/personal capacity.

8.     At all times herein mentioned, the City of Chicago was a municipal corporation operating under the laws of Illinois.

9.     At all times herein mentioned, all unknown and unnamed officers/detectives were members of the City of Chicago Police Department, and were acting under color of state law and as the employee, agent, or representative of the City of Chicago. These officers/detectives will be named when their names are ascertained.

2

## FACTS

10.     On June 27, 2000, at approximately 6:00 to 6:30 p.m., two people, Valerie Davis and James Jones, were murdered while in their vehicle located in the vicinity of Bishop and 63rd street in Chicago, Illinois. Somebody shot them at close range, killing them.

11.     Subsequent to this shooting, at approximately 9:30 p.m. plaintiff Pernell went to the vicinity of Ogden Park, at 64th and Ada to retrieve his car. At this time and place, Pernell was arrested. There was no probable cause for Pernell's arrest.

12.     Pernell was questioned by the arresting detectives, Riley and Kelly, and Pernell denied engaging in any shooting. There were no witnesses identifying Pernell as the shooter of either Davis or Jones.

13.     Shortly after 9:30 p.m., Riley and Kelly transported Pernell to Area 1, Detective Division, and brought Pernell to a small room, roughly 8 by 8, with only a small metal bench and a ring on the wall within the room. The room was lit and had working air conditioning. The ring on the wall was used to fasten a handcuff, attached to Pernell's left arm, to the wall. There were no windows to the room.

14.     After bringing Pernell to the room, Riley and Kelly left, leaving Pernell by himself.

15.     Over the next 66-68 hours, or from the night of Tuesday June 27th to the late afternoon of Friday June 30th 2000, Pernell was subjected to a psychological and physical enormously abusive set of conditions of confinement designed to elicit false statements from Pernell. This included the following:

3

a.     Remaining handcuffed to the wall and being forced to remain with very limited movement until Thursday June 29th thus causing his left arm to go numb;

b.     Maintaining the interrogation room with the light on at all times, the handcuff in place as stated above, and the air conditioning uncomfortably cold (Pernell remained dressed only in shorts and a T-shirt) so that Pernell would be sleep deprived;

c.     Being deprived of all food and water from June 27th until the late afternoon of June 30th, other than a single bologna sandwich that was given to him on June 29th;

d.     Being deprived of access to a bathroom, except for a single occasion on June 29th (at which time Pernell also obtained a gulp of water), thus being forced to urinate on himself; and

e.     Being subjected to a beating on June 30th, by defendants Farley and Lenihan, in which they struck Pernell in the stomach with a fist numerous times, and struck Pernell with a telephone book to the back of the head numerous times.

7.     Shortly after being placed into the interrogation room, defendants Kelly and Riley came to the room. There, they questioned Pernell and told him to tell them (Kelly and Riley) "what I want to hear." Pernell responded by saying that he did not know what they were talking about.

8.     The event described in the previous paragraph occurred on several additional occasions with Riley and Kelly and two as yet unknown detectives, until Pernell was removed from his original room (for undisclosed reasons) by defendants Farley and Lenihan, to another room on Friday, June 30th. On each occasion until the last one with Farley and Lenihan on June 30th, Pernell indicated that he did not do any shooting.

4

9.    On June 30th, as noted in the preceding paragraphs, Farley and Lenihan moved Pernell to another room and subjected him to unnecessary and unreasonable force. At no time did Pernell use any force or resist anything done by these or any defendants.

10.    Also during the July 30th encounter with Farley and Lenihan, the latter defendants accused Pernell of shooting out of a vehicle and ordered Pernell to "cooperate with us or its going to get worse."

11.    During the time that he was being ordered to "cooperate" and while being beaten, Pernell repeatedly asked to see a lawyer. His requests were denied.

12.    Thereafter, solely as a result of the coercive interrogation process, Pernell indicated that he would do and say want the defendants Farley and Lenihan wanted him to do and say. Farley then read from a pad a series of false statements which he indicated he wanted Pernell to repeat. In sum and substance, these statements were to the effect that Pernell shot a gun out of a vehicle that he had been in on June 27th 2000 at approximately 6:00 p.m. Pernell indicated that he would repeat these statements for Farley.

13.    Subsequently, a prosecutor entered the room and eventually in the late afternoon of June 30, 2000, on a video, with Farley at this side, Pernell falsely stated, among other things, that he shot a gun out of the window of a car.

14.    Pernell did not know at this time about the murder of Davis and Jones (and, in fact, he did not "confess" to this murder). However, the defendants and the prosecutor put Pernell's false statement (to the effect that he shot out of a car) together with the murder of Davis and Jones, and used Pernell's statement to charge him with the murder of these two individuals.

15.    There were no witnesses or other physical evidence linking Pernell to the murders.

16. Following Pernell's video taped statements, he was taken for the first time to a judge. However, this did not happen until roughly 90 hours after his arrest.

17. At no time did any defendant read Pernell his *Miranda* rights. Pernell was also refused repeated requests while in custody to call his mother.

18. Pernell was charged with, among other things, the murder of Davis and Jones. There was no probable cause to charge him with those murders or any other crime.

19. The prosecution and continued prosecution of Pernell were without probable cause. Each of the individual defendants acted individually and in a conspiracy with one another to wrongfully confine plaintiff as alleged above, and to conceal from the court and plaintiff these facts along with exculpatory facts.

20. Pernell, through his attorney, made a motion to suppress his statements during the course of the criminal proceedings against him. This motion was based upon all the facts of his incarceration, as stated in this complaint, leading up to and including his video taped statement. This motion was granted on February 26, 2003.

21. In granting this motion, the Honorable Thomas R. Sumner stated, in part, that

As far as I am concerned, 66 hours [of confinement prior to the video-taped statement] is too long, way too long. Now, I agree with counsel. Not one officer in that situation came in and could recall whether or not he took the defendant to the bathroom.

22. Following the motion to suppress being granted, the charges against Pernell were dismissed on April 10, 2003. The case was terminated in Pernell's favor.

23. The defendants and each of them, willfully, wantonly and maliciously concealed the fact that they had coerced false statements from Pernell by the use of psychologically coercive techniques and the use of excessive force. The defendants concealed this information and never disclosed any of this in their false police reports.

6

24. Further, while Pernell's interrogations were taking place and thereafter, the defendants failed to follow up on other information revealing the person(s) involved in the shooting of Davis and Jones.

25. Pernell in no way consented to any of the above described wrongful conduct.

26. By reason of the above-described acts and omissions, Pernell sustained injuries, including but not limited to, physical injuries and psychological injuries. He also suffered great physical, mental and emotional pain and suffering as a result of his incarceration and the false charges placed against him. This is all to his damage in an amount to be ascertained.

28. The aforementioned acts and omissions of defendants and each of them, except for the City of Chicago, were willful, wanton, malicious, oppressive and done with reckless indifference to and/or callous disregard for Plaintiff's rights and justify the awarding of exemplary and punitive damages in an amount to be ascertained according to proof at the time of trial.

29. By reason of the above-described acts and omissions of defendants and each of them, Plaintiff was required to retain an attorney to institute, prosecute and render legal assistance to him in the within action so that he might vindicate the loss and impairment of his rights. By reason thereof, Plaintiff requests payment by Defendants, and each of them, of a reasonable sum for attorney's fees pursuant to 42 U.S.C. Section 1988, the Equal Access to Justice Act or any other provision set by law.

## COUNT I

## VIOLATION OF CIVIL RIGHTS – A CONFINEMENT IN VIOLATION OF
## PLAINTIFF'S DUE PROCESS RIGHTS

30. Plaintiff incorporates and alleges paragraphs 1-29 as though fully alleged at this place.

31. The individual defendants and each of them, individually and in a conspiracy with one another, subjected the plaintiff, Mikel Pernell, to conditions of confinement, prior to his video-taped statement, that were unlawful, unreasonable, and shocked the conscience. These psychological conditions, as stated above, included lengthy confinement without food, without bathroom access, continuous handcuffing to a wall , and continuous light and air conditioning without adequate clothing thus preventing the ability to reasonably sleep.

32. These conditions also included physical coercion, the failure to give Miranda warnings, and holding plaintiff *incommunicado* for a lengthy period of time.

33. Defendants' purpose in confining the plaintiff as they did was malicious and for the purpose of extracting false statements from him so that he would falsely implicate himself in a crime he did not commit.

34. On April 10, 2003, all the criminal charges against the plaintiff were dismissed, and thus, at that point, this complaint would not and could not undermine the validity of the potential criminal conviction for murder and/or related crimes.

35. Each of the individual defendants' conduct was in violation of the Fourth, Fifth, Sixth, and/or Fourteenth Amendments to the United States Constitution and laws enacted

thereunder. As a result, these defendants are liable to the plaintiff under, but not limited to, 42 U.S.C. §1983.

## COUNT II

## VIOLATION OF CIVIL RIGHTS – FAILURE TO PROMPTLY PROCESS PLAINTIFF FOLLOWING HIS ARREST

36.  Plaintiff incorporates and alleges paragraphs 1-29 as though fully alleged at this place.

37.  Plaintiff was held for roughly 66-68 hours before he was coerced to make false statements implicating himself in criminal activity.

38.  Plaintiff was held for roughly 90 hours before he was brought in front of a judge.

39.  On April 10, 2003, all the criminal charges against the plaintiff were dismissed, and thus, at that point, this complaint would not and could not undermine the validity of the potential criminal conviction for murder and/or related crimes.

40.  This delay in and of itself is a violation of the the Fourth and/or Fourteenth Amendment to the United States Constitution requiring a prompt judicial determination of probable cause following a warrantless arrest. As a result, the individual defendants and each of them are liable under 42 U.S.C. §1983.

## COUNT III

## SUPPLEMENTAL STATE CLAIM – MALICIOUS PROSECUTION

41.  Plaintiff incorporates and alleges paragraphs 1-29 as though fully alleged at this place

42. Each of the individual defendants, individually and/or in a conspiracy, caused, initiated, and continued a malicious prosecution of the plaintiff without probable cause.

43. The criminal proceedings terminated in plaintiff's favor on April 10, 2003.

44. The defendants and each of them acted maliciously in initiating and in continuing the prosecution of the plaintiff.

45. Plaintiff was injured as set forth above.

## COUNT IV

## SUPPLEMENTAL STATE CLAIM – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

46. Plaintiff incorporates and alleges paragraphs 1-29 as though fully alleged at this place

47. Each of the defendants, individually and in a conspiracy engaged in extreme and outrageous behavior against the plaintiff by engaging in grossly wrongful interrogation tactics designed to elicit false statements. Their acts and the concealment of their acts until the termination of proceedings against plaintiff were extreme and outrageous.

48. Each of the defendants are thus liable for the intentional infliction of emotional distress caused by their actions as set forth above.

## COUNT V

## SUPPLEMENTAL STATE CLAIM – RESPONDEAT SUPERIOR AGAINST THE CITY OF CHICAGO

49.     Plaintiff incorporates and alleges paragraphs 1-29 as though fully alleged at this place

50.     Each of the individual defendants were at all times relevant to this action employees and agents of the City of Chicago. Each of the above-named and unnamed defendants was acting within the scope of his employment when he engaged in the actions described in this complaint as these allegations relate to Counts III and IV above. Thus, The City of Chicago is liable for the acts of these individuals under the doctrine of *respondeat superior.*

## RELIEF REQUESTED

WHEREFORE, plaintiff, Mikel Pernell, by and through his attorneys, ED FOX & ASSOCIATES, requests judgment on each Count as follows against each and every Defendant:

1.      That the Defendants and each of them be required to pay Plaintiffs' general damages, including emotional distress, in a sum to be ascertained;

2.      That the Defendants be required to pay Plaintiffs' special damages in a sum to be ascertained;

3.      That the individual Defendants be required to pay Plaintiffs' attorneys fees pursuant to Section 1988 of Title 42 of the United States Code, the Equal Access to Justice Act or any other applicable provision;

4. That each of the individual Defendants be required to pay punitive and exemplary damages in a sum to be ascertained;

5. That all Defendants be required to pay Plaintiffs' costs of the suit herein incurred; and

6. That Plaintiff has such other and further relief as this Court may deem just and proper.

Dated: July 30, 2003

BY: _____
Edward M. Fox

## PLAINTIFF HEREBY REQUESTS A TRIAL BY JURY

BY: _____
Edward M. Fox

ED FOX & ASSOCIATES
Attorneys for Plaintiff
134 N. LaSalle Street
Suite 1908
Chicago, Illinois 60602
(312) 345-8877

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| **MIKEL PERNELL,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 03 CV 5316 |
| | ) | |
| v. | ) | |
| | ) | |
| Chicago Police Officers **EDWARD FARLEY, Star No.** | ) | Honorable Matthew |
| **20643; THOMAS KELLY, Star No. 20229, ROBERT** | ) | F. Kennelly |
| **LENIHAN, Star No. 20593, JAMES RILEY, Star No.** | ) | |
| **20250,** the **CITY OF CHICAGO,** a Municipal | ) | |
| Corporation, and unknown and unnamed officers, | ) | |
| | ) | |
| Defendants. | ) | |

## NOTICE OF FILING

TO:   Penelope George                      Stacy Benjamin
      Assistant Corporation Counsel         Assistant Corporation Counsel
      30 N. LaSalle Street, 900             30 N. LaSalle Street, Suit 1400
      Chicago, IL 60602                     Chicago, IL 60602

**PLEASE TAKE NOTICE** that on September 13, 2004, the undersigned filed with the
Clerk of this Court, **Plaintiff's Amended Complaint,** service of which is being made upon you.

Edward M. Fox

ED FOX & ASSOCIATES
300 West Adams, Suite 330
Chicago, IL 60606
(312) 345-8877

## CERTIFICATE OF SERVICE

I, Laura Echavarria, a non-attorney, under penalty of perjury, state that on September 13,
2004, I mailed this notice to the above listed parties at above listed addresses by placing same in the
U.S. Mail located at 300 West Adams Street, Chicago, Illinois before 5 p.m. with proper postage
prepaid.

Laura Echavarria

## IN THE UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| **MIKEL PERNELL,** ) | |
| ) | |
| Plaintiff, ) | Case No. 03 C 5316 |
| ) | |
| v. ) | |
| ) | **AMENDED** |
| Chicago Police Officers **EDWARD FARLEY, Star No.** ) | **COMPLAINT FOR** |
| **20643; THOMAS KELLY, Star No. 20229, ROBERT** ) | **VIOLATION OF** |
| **LENIHAN, Star No. 20593, JAMES RILEY, Star No.** ) | **CIVIL RIGHTS AND** |
| **20250,** the **CITY OF CHICAGO,** a Municipal ) | **SUPPLEMENTAL STATE** |
| Corporation, and unknown and unnamed officers, ) | **CLAIMS** |
| ) | |
| ) | **JUDGE KENNELLY** |
| ) | |
| ) | **DEMAND FOR** |
| Defendants. ) | **JURY TRIAL** |

### JURISDICTION AND VENUE

1.      This action arises under the United States Constitution and the Civil Rights Act of
1871 [42 U.S.C. Section 1983]. This court has jurisdiction under and by virtue of 28 U.S.C.
Sections 1343 and 1331.

2.      Venue is founded in this judicial court upon 28 U.S.C. Section 1391 as the acts
complained of arose in this district.

### PARTIES

3.      At all times herein mentioned, plaintiff Mikel Pernell ("Pernell"), was and now is a
citizen of the United States, and resides within the jurisdiction of this court.

4.      At all times herein mentioned defendant, Detective James Riley, Star No. 20250 ("Riley") was a member of the City of Chicago Police Department, and was acting under color of state law and as the employee, agent or representative of the City of Chicago. Riley is being sued in his individual/personal capacity.

5.      At all times herein mentioned defendant, Detective Thomas Kelly, Star No. 20229 ("Kelly") was a member of the City of Chicago Police Department, and was acting under color of state law and as the employee, agent or representative of the City of Chicago. Kelly is being sued in his individual/personal capacity.

6.      At all times herein mentioned defendant, Detective Edward Farley, Star No. 20643 ("Farley") was a member of the City of Chicago Police Department, and was acting under color of state law and as the employee, agent or representative of the City of Chicago. Farley is being sued in his individual/personal capacity.

7.      At all times herein mentioned defendant, Detective Robert Lenihan Star No. 20593 ("Lenihan") was a member of the City of Chicago Police Department, and was acting under color of state law and as the employee, agent or representative of the City of Chicago. Lenihan is being sued in his individual/personal capacity.

8.      At all times herein mentioned, the City of Chicago was a municipal corporation operating under the laws of Illinois.

9.      At all times herein mentioned, all unknown and unnamed officers/detectives were members of the City of Chicago Police Department, and were acting under color of state law and as the employee, agent, or representative of the City of Chicago. These officers/detectives will be named when their names are ascertained.

2

## FACTS

10.    On June 27, 2000, at approximately 6:00 to 6:30 p.m., two people, Valerie Davis and James Jones, were murdered while in their vehicle located in the vicinity of Bishop and 63rd street in Chicago, Illinois. Somebody shot them at close range, killing them.

11.    Subsequent to this shooting, at approximately 9:30 p.m. plaintiff Pernell went to the vicinity of Ogden Park, at 64th and Ada to retrieve his car. At this time and place, Pernell was arrested. There was no probable cause for Pernell's arrest.

12.    Pernell was questioned by the arresting detectives, Riley and Kelly, and Pernell denied engaging in any shooting. There were no witnesses identifying Pernell as the shooter of either Davis or Jones.

13.    Shortly after 9:30 p.m., Riley and Kelly transported Pernell to Area 1, Detective Division, and brought Pernell to a small room, roughly 8 by 8, with only a small metal bench and a ring on the wall within the room. The room was lit and had working air conditioning. The ring on the wall was used to fasten a handcuff, attached to Pernell's left arm, to the wall. There were no windows to the room.

14.    After bringing Pernell to the room, Riley and Kelly left, leaving Pernell by himself.

15.    Over the next 66-68 hours, or from the night of Tuesday June 27th to the late afternoon of Friday June 30th 2000, Pernell was subjected to a psychological and physical enormously abusive set of conditions of confinement designed to elicit false statements from Pernell. This included the following:

3

a.     Remaining handcuffed to the wall and being forced to remain with very limited movement until Thursday June 29th thus causing his left arm to go numb;

b.     Maintaining the interrogation room with the light on at all times, the handcuff in place as stated above, and the air conditioning uncomfortably cold (Pernell remained dressed only in shorts and a T-shirt) so that Pernell would be sleep deprived;

c.     Being deprived of all food and water from June 27th until the late afternoon of June 30th, other than a single bologna sandwich that was given to him on June 29th;

d.     Being deprived of access to a bathroom, except for a single occasion on June 29th (at which time Pernell also obtained a gulp of water), thus being forced to urinate on himself; and

e.     Being subjected to a beating on June 30th, by defendants Farley and Lenihan, in which they struck Pernell in the stomach with a fist numerous times, and struck Pernell with a telephone book to the back of the head numerous times.

16.     Shortly after being placed into the interrogation room, defendants Kelly and Riley came to the room. There, they questioned Pernell and told him to tell them (Kelly and Riley) "what I want to hear." Pernell responded by saying that he did not know what they were talking about.

17.     The event described in the previous paragraph occurred on several additional occasions with Riley and Kelly and two as yet unknown detectives, until Pernell was removed from his original room (for undisclosed reasons) by defendants Farley and Lenihan, to another room on Friday, June 30th. On each occasion until the last one with Farley and Lenihan on June 30th, Pernell indicated that he did not do any shooting.

4

18.        On June 30th, as noted in the preceding paragraphs, Farley and Lenihan moved Pernell to another room and subjected him to unnecessary and unreasonable force. At no time did Pernell use any force or resist anything done by these or any defendants.

19.        Also during the July 30th encounter with Farley and Lenihan, the latter defendants accused Pernell of shooting out of a vehicle and ordered Pernell to "cooperate with us or its going to get worse."

20.        During the time that he was being ordered to "cooperate" and while being beaten, Pernell repeatedly asked to see a lawyer. His requests were denied.

21.        Thereafter, solely as a result of the coercive interrogation process, Pernell indicated that he would do and say want the defendants Farley and Lenihan wanted him to do and say. Farley then read from a pad a series of false statements which he indicated he wanted Pernell to repeat. In sum and substance, these statements were to the effect that Pernell shot a gun out of a vehicle that he had been in on June 27th 2000 at approximately 6:00 p.m. Pernell indicated that he would repeat these statements for Farley.

22.        Subsequently, a prosecutor entered the room and eventually in the late afternoon of June 30, 2000, on a video, with Farley at this side, Pernell falsely stated, among other things, that he shot a gun out of the window of a car.

23.        Pernell did not know at this time about the murder of Davis and Jones (and, in fact, he did not "confess" to this murder). However, the defendants and the prosecutor put Pernell's false statement (to the effect that he shot out of a car) together with the murder of Davis and Jones, and used Pernell's statement to charge him with the murder of these two individuals.

24.        There were no witnesses or other physical evidence linking Pernell to the murders.

5

25.    Following Pernell's video taped statements, he was taken for the first time to a judge. However, this did not happen until roughly 90 hours after his arrest.

26.    At no time did any defendant read Pernell his *Miranda* rights. Pernell was also refused repeated requests while in custody to call his mother.

27.    Pernell was charged with, among other things, the murder of Davis and Jones. There was no probable cause to charge him with those murders or any other crime.

28.    The prosecution and continued prosecution of Pernell were without probable cause. Each of the individual defendants acted individually and in a conspiracy with one another to wrongfully confine plaintiff as alleged above, and to conceal from the court and plaintiff these facts along with exculpatory facts.

29.    Pernell, through his attorney, made a motion to suppress his statements during the course of the criminal proceedings against him. This motion was based upon all the facts of his incarceration, as stated in this complaint, leading up to and including his video taped statement. This motion was granted on February 26, 2003.

30.    In granting this motion, the Honorable Thomas R. Sumner stated, in part, that

As far as I am concerned, 66 hours [of confinement prior to the video-taped statement] is too long, way too long. Now, I agree with counsel. Not one officer in that situation came in and could recall whether or not he took the defendant to the bathroom.

31.    Following the motion to suppress being granted, the charges against Pernell were dismissed on April 10, 2003. The case was terminated in Pernell's favor.

32.    The defendants and each of them, willfully, wantonly and maliciously concealed the fact that they had coerced false statements from Pernell by the use of psychologically coercive techniques and the use of excessive force. The defendants concealed this information and never disclosed any of this in their false police reports.

6

33.    Further, while Pernell's interrogations were taking place and thereafter, the defendants failed to follow up on other information revealing the person(s) involved in the shooting of Davis and Jones.

34.    Pernell in no way consented to any of the above described wrongful conduct.

35.    By reason of the above-described acts and omissions, Pernell sustained injuries, including but not limited to, physical injuries and psychological injuries. He also suffered great physical, mental and emotional pain and suffering as a result of his incarceration and the false charges placed against him. This is all to his damage in an amount to be ascertained.

36.    The aforementioned acts and omissions of defendants and each of them, except for the City of Chicago, were willful, wanton, malicious, oppressive and done with reckless indifference to and/or callous disregard for Plaintiff's rights and justify the awarding of exemplary and punitive damages in an amount to be ascertained according to proof at the time of trial.

37.    By reason of the above-described acts and omissions of defendants and each of them, Plaintiff was required to retain an attorney to institute, prosecute and render legal assistance to him in the within action so that he might vindicate the loss and impairment of his rights. By reason thereof, Plaintiff requests payment by Defendants, and each of them, of a reasonable sum for attorney's fees pursuant to 42 U.S.C. Section 1988, the Equal Access to Justice Act or any other provision set by law.

7

### COUNT I

## VIOLATION OF CIVIL RIGHTS – A CONFINEMENT IN VIOLATION OF PLAINTIFF'S DUE PROCESS RIGHTS

38.    Plaintiff incorporates and alleges paragraphs 1-37 as though fully alleged at this place.

39.    The individual defendants and each of them, individually and in a conspiracy with one another, subjected the plaintiff, Mikel Pernell, to conditions of confinement, prior to his video-taped statement, that were unlawful, unreasonable, and shocked the conscience. These psychological conditions, as stated above, included lengthy confinement without food, without bathroom access, continuous handcuffing to a wall, and continuous light and air conditioning without adequate clothing thus preventing the ability to reasonably sleep.

40.    These conditions also included physical coercion, the failure to give Miranda warnings, and holding plaintiff *incommunicado* for a lengthy period of time.

41.    Defendants' purpose in confining the plaintiff as they did was malicious and for the purpose of extracting false statements from him so that he would falsely implicate himself in a crime he did not commit.

42.    On April 10, 2003, all the criminal charges against the plaintiff were dismissed, and thus, at that point, this complaint would not and could not undermine the validity of the potential criminal conviction for murder and/or related crimes.

8

43.    Each of the individual defendants' conduct was in violation of the Fourth, Fifth, Sixth, and/or Fourteenth Amendments to the United States Constitution and laws enacted thereunder. As a result, these defendants are liable to the plaintiff under, but not limited to, 42 U.S.C. §1983.

## COUNT II

## VIOLATION OF CIVIL RIGHTS – FAILURE TO PROMPTLY PROCESS PLAINTIFF FOLLOWING HIS ARREST

44.    Plaintiff incorporates and alleges paragraphs 1-37 as though fully alleged at this place.

45.    Plaintiff was held for roughly 66-68 hours before he was coerced to make false statements implicating himself in criminal activity.

46.    Plaintiff was held for roughly 90 hours before he was brought in front of a judge.

47.    On April 10, 2003, all the criminal charges against the plaintiff were dismissed, and thus, at that point, this complaint would not and could not undermine the validity of the potential criminal conviction for murder and/or related crimes.

48.    This delay in and of itself is a violation of the the Fourth and/or Fourteenth Amendment to the United States Constitution requiring a prompt judicial determination of probable cause following a warrantless arrest. As a result, the individual defendants and each of them are liable under 42 U.S.C. §1983.

9

## COUNT III

## SUPPLEMENTAL STATE CLAIM – MALICIOUS PROSECUTION

49.    Plaintiff incorporates and alleges paragraphs 1-37 as though fully alleged at this place

50.    Each of the individual defendants, individually and/or in a conspiracy, caused, initiated, and continued a malicious prosecution of the plaintiff without probable cause.

51.    The criminal proceedings terminated in plaintiff's favor on April 10, 2003.

52.    The defendants and each of them acted maliciously in initiating and in continuing the prosecution of the plaintiff.

53.    Plaintiff was injured as set forth above.

## COUNT IV

## SUPPLEMENTAL STATE CLAIM – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

54.    Plaintiff incorporates and alleges paragraphs 1-37 as though fully alleged at this place

55.    Each of the defendants, individually and in a conspiracy engaged in extreme and outrageous behavior against the plaintiff by engaging in grossly wrongful interrogation tactics designed to elicit false statements. Their acts and the concealment of their acts until the termination of proceedings against plaintiff were extreme and outrageous.

56.    Each of the defendants are thus liable for the intentional infliction of emotional distress caused by their actions as set forth above.

## COUNT V

## SUPPLEMENTAL STATE CLAIM – RESPONDEAT SUPERIOR AGAINST THE CITY OF CHICAGO

57.    Plaintiff incorporates and alleges paragraphs 1-37 as though fully alleged at this place

58.    Each of the individual defendants were at all times relevant to this action employees and agents of the City of Chicago. Each of the above-named and unnamed defendants was acting within the scope of his employment when he engaged in the actions described in this complaint as these allegations relate to Counts III and IV above. Thus, The City of Chicago is liable for the acts of these individuals under the doctrine of *respondeat superior*.

## COUNT VI.

## VIOLATION OF CIVIL RIGHTS – PLAINTIFF AGAINST THE CITY OF CHICAGO

59.    Plaintiff hereby incorporates and re-alleges paragraphs one 1 through 37 hereat as though fully alleged at this place.

60.    During all relevant times, the City of Chicago knowingly, and with willful and deliberate indifference to the Constitutional rights of citizens, maintained and permitted a widespread custom and practice of permitting the occurrence of the types of wrongs set forth in the following paragraph.

11

61.     During all relevant times, the City of Chicago maintained a widespread custom and practice of not promptly obtaining a probable cause or preliminary hearing for arrestees of felony crimes. In fact, it was the widespread custom, practice and belief that officers and detectives could and did have 72 hours (known as a "rule of thumb") to simply decide to charge and then "book" or process the arrestee. Officers and detectives also believed and customarily practiced that longer than 72 hours could be taken for such things as further investigations. After booking of an arrestee, additional time was then customarily taken (beyond 72 or more hours) before the arrestee was brought before a judge for a probable cause or preliminary hearing.

62.     Further, during all relevant times, the City of Chicago failed to train its officers and detectives to obtain a prompt probable cause or preliminary hearing, and/or affirmatively trained and instructed officers and detectives that it was appropriate not to require a probable cause or preliminary hearing before 72 hours had elapsed after the suspect had been arrested.

63.     Plaintiff alleges that these customs, policies and training, described above, were the moving force behind the violations of the Plaintiff's rights. During all relevant times, the law required that officers obtain probable cause determinations from a neutral magistrate for a felony arrestee within 48 hours of arrest. Based upon the principles set forth in Monell v. New York City Department of Social Services, the City of Chicago is liable for all the harm done to plaintiff as set forth above.

64.     As a result of not timely obtaining a timely probable cause hearing, plaintiff was injured in all the ways set forth above.

12

**PLAINTIFF HEREBY REQUESTS A TRIAL BY JURY**

BY:_____

Edward M. Fox


ED FOX & ASSOCIATES
Attorneys for Plaintiff
300 West Adams Street
Suite 330
Chicago, Illinois 60606
(312) 345-8877

## RELIEF REQUESTED

WHEREFORE, plaintiff, Mikel Pernell, by and through his attorneys, ED FOX & ASSOCIATES, requests judgment on each Count as follows against each and every Defendant:

1.    That the Defendants and each of them be required to pay Plaintiffs' general damages, including emotional distress, in a sum to be ascertained;

2.    That the Defendants be required to pay Plaintiffs' special damages in a sum to be ascertained;

3.    That the Defendants be required to pay Plaintiffs' attorneys fees pursuant to Section 1988 of Title 42 of the United States Code, the Equal Access to Justice Act or any other applicable provision;

4.    That each of the individual Defendants be required to pay punitive and exemplary damages in a sum to be ascertained;

5.    That all Defendants be required to pay Plaintiffs' costs of the suit herein incurred; and

6.    That Plaintiff has such other and further relief as this Court may deem just and proper.

Dated: August 20, 2004

BY: _____
Edward M. Fox

13